ADAMS et al. v. ST. JOHNS RIVER SHIP-
BUILDING CO.

Civ. No. 873 J.

District Court, S. D. Florida,
Jacksonville Division.

Feb. 11, 1947.

J. Ollie Edmunds and Alston Cockrell, both of Jacksonville, Fla., for plaintiffs.

Walter F. Rogers, Bedell & Bedell, and Damon G. Yerkes, Ass't U.S. Att'y, all of Jacksonville, Fla., and Erwin C. Catts, of Washington, D. C., for defendant.

STRUM, District Judge.

This is an action to recover overtime pay, damages and attorney's fees, pursuant to the Act of June 25, 1938, known as the Fair Labor Standards Act, 29 U.S.C.A. § 216. Each of the 85 plaintiffs alleges a violation by defendant of 29 U.S.C.A. §§ 206, 207, in that, they were required to work more than 40 hours per week without being paid one and one-half times the regular rate of pay for such overtime.

The defendant is a private industrial corporation, organized under the laws of Florida for the sole purpose of constructing a shipbuilding plant at Jacksonville, Florida, and constructing ships therein for the United States Maritime Commission.

Beginning early in 1943 and extending to February 24, 1945, the defendant corporation constructed a total of eighty-two 10,500-ton cargo ships called Liberty ships, and commenced construction of twelve 30,000 barrel tankers, five of which were completed. During most of this time only Liberty ships were being constructed, but during about the last six months of operation both Liberty ships and tankers were under construction. Some of the plaintiff employees worked on Liberty ships, some on tankers, and some on both.

These ships were constructed under contract between the United States Maritime Commission and the defendant corporation, pursuant to Public Law 247, 77th Congress, approved August 25, 1941, 55 Stat. 669, authorizing the construction of "merchant vessels of such type, size, and speed as the United States Maritime Commission * * * may determine to be useful for carrying on the commerce of the United States and suitable for conversion into naval or military auxiliaries." The contracts recite that the Commission has determined that the vessels therein described "are of a type, size and speed which will be useful for carrying on the commerce of the United States and suitable for conversion into naval or military auxiliaries, and desires the contractor (defendant) to construct said vessels." The contract also provides: "The contractor, acting as an independent contractor, and not as agent, shall construct, launch, equip and complete" said ships. When the Liberty ships were delivered to the Maritime Commission, they were immediately put into service transporting food, ammunition, and all sorts of materials and supplies, in aid of the Armed Forces, between United States ports and to foreign countries, in the prosecution of the war with Germany and Japan. They are also suitable for civilian cargo carriers in peace time.

Such of the tankers as were completed before the termination of hostilities, were delivered to the Maritime Commission, and immediately turned over to the Navy for the transportation of fuel oil to various parts of the world. These tankers were of a special · design suitable to the Navy's needs, and were primarily intended for the transportation of fuel oils between certain islands in the Pacific, in connection with the war with Japan. As originally delivered, the tankers would not meet the requirements of the Coast Guard for the issuance of a certificate for general operation in civilian pursuits, and they are deemed more or less uneconomical for

civilian use. Without altering the fundamental design of the vessel, however, and with certain modifications pertaining largely to safety, the crew's living quarters, the removal of guns, etc., they are readily adaptable to civilian purposes for transporting fuel oils.

The Fair Labor Standards Act, 29 U.S.C.A. § 203, expressly defines commerce as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." It defines "goods" as used in the expression "production of goods for commerce" as "including ships and marine equipment." Not only the contract under which the vessels were constructed, but the use for which they were built and to which they were immediately put, places their construction within the meaning of "production of goods for commerce," as defined by the Act. It is abundantly clear that the vessels were intended to, and did, engage in interstate and foreign "transportation," and that they were produced for that purpose. Much is made by the defendant of the fact that the tankers were of a special design suitable for the Navy, but undesirable for civilian use. The use to which these vessels were put by the Navy alone constitutes engaging in commerce, but in addition thereto they are readily adaptable to civilian use for the same purpose, though they may not be as desirable for that use as other tankers. Inherently, however, they are susceptible of and intended for such use. Whether or not they are practicable for that use is not determinative of the question here presented. The fact that non-fundamental alterations are necessary before they are used for general commerce, does not preclude their construction from the purview of production of goods for commerce.

The United States owned the yards, buildings, tools and appurtenances. The United States furnished "in kind" approximately 75% of the materials entering into the vessels. The defendant contractor purchased the remaining approximately 25% of the materials with its own funds. These materials moved in interstate commerce before reaching these construction yards.

Defendant also procured on its own resources all funds for payrolls and other operating expenses, for all of which it was reimbursed by the Maritime Commission on a cost-plus variable fee basis. Title to the vessels was in the United States, though possession and control remained with defendant contractor until completion, delivery, and acceptance of each ship. In carrying on these activities, these employees were hired, discharged, and controlled by the defendant corporation, not by the United States. The defendant corporation acted as an independent contractor, and not as an agent of the United States Maritime Commission. It is so provided by the contracts and established by the facts. These employees were in private employment, just as the employees of any other private enterprise. They were not in the employ of the United States. The employees are therefore not excluded from the operation of the Act by the definition of "employer," 29 U.S.C.A. § 203, which provides that the word "employer" shall not include "the United States or any State or political subdivision of a State."

The Court finds that the employees engaged in the construction of both Liberty ships and tankers were engaged in "the production of goods for commerce," and that they were the employees of a private industrial corporation and not of the United States, so that, unless exempt for other reasons, they are within the coverage of the Act. Timberlake v. Day & Zimmerman, D.C., 49 F.Supp. 28; Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102.

There are now before the Court for consideration three types of employees: (1) The editor of a publication issued in connection with the company's publicity; (2) expediters; and (3) sergeants of the civilian guard, employed for security purposes. The defendant contends that these employees are exempt from the Act under 29 U.S.C.A. § 213, the editor and expediters as administrative employees, and the sergeants of the guard as executive employees. They were compensated on a weekly salary basis for their entire work week, which fluctuated, but usually exceeded 40 hours. They received no overtime pay.

■ The editor: The defendant company issued at irregular intervals an illustrated magazine called "Quarterdeck," which carried stories of interest in connection with the construction of these vessels, particularly their launching, and stories concerning the personnel of the company and the yard. Plaintiff Edwin Whitney was put in charge of this publication as editor. The job required specialized training, knowledge and experience. A portion of the material published was given him by the company, but he wrote much of it himself, and conceived and executed the general make-up of the publication. While, of course, he was subject to censorship rules, as was everyone else in the yard, and was required to submit the text, illustrations, and make-up to a superior for approval, he was compensated at a sum greater than $200 per month, his employment was non-manual, and he operated under only general supervision upon tasks which were directly related to management policies or general business operations involving the exercise of discretion and independent judgment. The Court holds this employee to be an administrative employee and exempt under the administrator's definition of that term. 29 U.S.C.A. § 541.2. The factual situation here differs from that in Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445, where the exemption claimed was that of "professional" employee.

The expediters: Plaintiffs R. A. Adams, Frank L. Aitcheson, Jr., I. F. Cunningham, W. H. Palmer, R. T. Slappey, J. I. McLaughlin, C. S. Pipkin, and Julian A. Fischer were "warehouse" expediters. Adams and Pipkin were expediters. Adams and Pipkin were known as "wet dock" expediters. The duties of all these expediters were fundamentally the same, though differing in detail. When a ship was launched, she was usually about 65% to 70% complete. The remainder of the work was finished while the vessel was afloat at the outfitting dock. In order to attain the speed with which it was necessary to complete these vessels and put them into service, it was necessary that the construction and outfitting work be highly systematized. The craft workmen worked in groups on various specific tasks under supervision of foremen. These employees did the actual construction work. Riggers and outfitters, working in groups, did the outfitting. It was necessary to have materials and supplies available to them at the time when and the place where needed, and to have it there punctually, in order not to delay the work. This was the job of the expediters. As the ship progressed, bills of materials were made out showing exactly what material was needed for which ship, and when. Other similar information was contained on the blueprints of the ships. It was the duty of the warehouse expediters to locate the necessary materials and supplies in and about the warehouses or in other places in the yard, and to assemble it in one group aboard a truck or other conveyance to be sent to the shipside at the wet dock. The expediter was furnished specific and complete bills of material, and he knew either from experience, or by direct instructions, when a given lot of material was needed at a given spot. It was his job to have it there. He was often required to travel about the yards to locate the material and sometimes he was required to exercise ingenuity in finding and procuring it, and getting it loaded for movement to the shipside.

The wet dock expediters operated, as their name implies, on the docks alongside the ship. When a warehouse expediter sent a bill of material down to the wet dock, it was the job of the wet dock expediter to receive the material at the shipside and have it placed on the dock in an advantageous position with reference to where it would be needed on the ship, and so as not to impede or obstruct other activities on the docks. When word was given from the ship that they were ready for the material, the wet dock expediter procured and supervised the hoisting of the material over the side of the ship, where it was turned over to still another expediter aboard the ship, who saw to it that it was sent to the proper place on the ship.

It is indispensable that these expediters be alert and efficient. A substantial amount of experience is also necessary. But these expediters exercised no independent judgment or discretion. Fundamentally, their job was purely "mechanical," in that they

received specific orders or directions as to what material was wanted, and where and when. They had no authority or discretion to deviate from or alter in the slightest degree any of these requirements. They carried out their functions according to rigorous formula, and were under direct supervision. Their job was one superior to that of common laborer, but the judgment and discretion they exercised was no greater than that exercised by any skilled workman. They had no authority to issue orders to others. Their duties were not directly related to management policies or general business operations along specialized or technical lines requiring specific training, experience or knowledge, and which requires the exercise of discretion and independent judgment. Nor did their work involve the execution under only general supervision of specific tasks directly related to management policies or general business operations. Experience was valuable in these tasks, as in all others, but they were not specialists any more than any other skilled employee, nor did their work involve any independent judgment, nor did their tasks directly relate to management policies or general business operations. They had a specific task to perform at a specific time and in a specified manner, which required no skill differing from that of the ordinary skilled workman.

■ The Court finds that these expediters are not exempt as administrative employees, but that they are entitled to the benefits of the Act. Distelhorst v. Day & Zimmerman, D.C., 58 F.Supp. 334; Walling v. St. Marys Sewer Pipe Co., D.C., 56 F.Supp. 345; Stanger v. Glenn L. Martin Co., D.C. 56 F.Supp. 163; Fellabaum v. Swift & Co., D.C., 54 F.Supp. 353; Fox v. Armour & Co., 33 A.2d 582, 21 N.J.Misc. 262.

The sergeants of the guard: For security purposes, the defendant corporation maintained a guard which was organized along the general plan of a police force. There was a chief, a captain, sergeants of the guard, and patrolmen. The patrolmen were organized into squads averaging, but sometimes exceeding, 18 to 20 men who patrolled specified beats. Each of these squads was in direct charge of a sergeant whose duties were to muster the squad at the beginning of a period of duty, see that they were ready for work, read to them any special orders that had been received from superiors; and see to it that they patrolled their assigned posts. The sergeants were directly answerable to the captain and chief. The sergeant also made three or four rounds during an eight-hour period of duty, to see that the patrolmen were alert and performing their assigned functions. It was the duty of this police force to maintain order in the yard, prevent thefts, report fires, and the like. Whenever a patrolman needed to temporarily leave his post, he was relieved for that period by the sergeant of that squad. The testimony indicates that the sergeants were engaged in this relief duty for 20% or more of their time.

The plaintiffs Walter Kimrey, C. W. Carson, and B. C. Schmidt were amongst these sergeants of the guard. They were compensated on a weekly salary basis, without overtime. Their work week fluctuated, but usually exceeded 40 hours. The defendant corporation contends that they are executive employees, and exempt as such from the Fair Labor Standards Act.

■ The Court finds that these sergeants were given specific instructions as to their duties, from which they were not allowed to deviate in any substantial particular. They had no discretionary managerial authority. They had no authority to hire or discharge other employees. Their recommendations as to promotions were given consideration, but carried no particular weight. In a substantial sense, they exercised no discretionary power. When an infraction occurred, they merely reported it. In effect, they were mere foremen of a squad of patrolmen, just as groups of craft employees were directed by a foreman. Their duties in no sense consisted of the management of the business, nor of any customarily recognized department or subdivision thereof, in the sense that this language is used in the administrator's definition of executive employee. The Court holds that these sergeants of the guard are not exempt as executive employees, but are

994

entitled to the benefits of the Act. Timberlake v. Day & Zimmerman, D.C., 49 F. Supp. 28.

■■ The defendant corporation stresses the fact that their labor set-up, employee bargaining methods and pay schedules were rigidly inspected and supervised by the National Labor Relations Board and by the Stabilization Unit of the Bureau of Internal Revenue, operating under the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 961 et seq. The defendant corporation points out that the National Labor Relations Board recognized the above-mentioned employees as either executive or administrative, and therefore excluded from bargaining units under the jurisdiction of that Board and the labor unions; that the Stablization Unit of the Bureau of Internal Revenue checked and examined the salaries paid to these employees, approved the same, and that the defendant could not have exceeded those salaries had it so desired. The defendant corporation contends that it acted in good faith under this supervision and believed that it was paying the lawful rate of pay to which these employees were entitled. The Court believes that the defendant corporation did act in good faith in these respects. But the Court finds that the expediters and sergeants of the guard were not exempt from the Act, and that they have not been compensated in accordance therewith. The provisions of the Act are mandatory upon the Courts, regardless of the good faith of the employer, or the reasonableness of his attitude. Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. Nor can other agencies of the Government, by approving some other method of pay, override Congressional will as expressed in the Act, even if such agencies desired so to do. The Stabilization Act itself provides (50 U.S.C.A.Appendix, § 964): "No action shall be taken under authority of this Act with respect to wages or salaries, (1) which is inconsistent with the provisions of the Fair Labor Standards Act of 1938, as amended, or the National Labor Relations Act * * *." Though the defendant corporation complied with and conformed to the directions of these administrative bodies, that fact will not excuse it from

non-compliance with the Fair Labor Standards Act, where the latter Act applies.

The Court holds that the expediters and sergeants of the guard above referred to should be compensated in accordance with the Act, to be computed according to the method prescribed in Overnight Motor Transp. Co. v. Missel, supra, and that they are entitled to the additional damages and attorney's fees, as provided by 29 U.S.C.A. § 216.

Judgment accordingly.