### DEVINE et al. v. JOSHUA HENDY CORPORATION.

No. 6176.

District Court, S. D. California, Central Division.

April 30, 1948.

894

Perry Bertram and David L. Mohr, both of Los Angeles, Cal., for plaintiffs.

Robert H. Sanders and Robert G. Irvin, both of Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

The action, originally begun against California Shipbuilding Corporation, a corporation, was instituted under the Fair Labor Standards Act of 1938,[1] on February 27, 1947. It seeks recovery of overtime, which the plaintiffs allege they were required to work, and for which they were not compensated.

Many proceedings were had before the trial, as disclosed by the voluminous record. Many questions of law were raised,—especially following the enactment of what is commonly known as the Portal-to-Portal Act of 1947, Public Law 49, 80th Congress; Chapter 52, 1st session,[2] which became law on May 14, 1947, when it was approved by the President.

Of the original plaintiffs, only twenty-nine actually remain in the case. The testimony given related to their claims.

We must, therefore, interpret this Act in its relation to the Fair Labor Standards Act.[3]

I

The Fair Labor Standards and the Portal-to-Portal Acts

■ The Fair Labor Standards Act, because of its nature and aim, has been construed liberally by all the courts which have had occasion to interpret it. Such liberality extends to all its provisions, and especially to what I might call—using an insurance term—"coverage." The courts have been very generous in determining which workmen are entitled to the benefits of the Act. One of the latest declarations on the subject is found in a case from the

[1] 29 U.S.C.A. §§ 201–219.
[2] 29 U.S.C.A. §§ 251–262.
[3] 29 U.S.C.A. § 201 et seq.

Tenth Circuit Court of Appeals.[4] Judge Bratton states:

"In respect of coverage of employees, the definitive provisions of the Act are extremely comprehensive in their sweep. United States v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301. The Act is remedial and must be given a liberal construction with its manifest intent and purpose in view. E. C. Schroeder Co. v. Clifton, 10 Cir., 153 F.2d 385, certiorari denied, [328 U.S. 858], 66 S.Ct. 1351, [90 L.Ed. 1629]; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52; Bowie v. Gonzalez, 1 Cir., 117 F.2d 11; Fleming v. Palmer, 1 Cir., 123 F.2d 749, certiorari denied Carribean Embroidery Co-op v. Fleming, 316 U.S. 662, 62 S.Ct. 942, 86 L.Ed. 1739; Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616. And in doubtful situations, coverage is to be determined broadly by reference to the underlying economic realities rather than by traditional rules governing legal classifications of master and servant on one hand, and employer and independent contractor on the other. Cf. National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170."

Another late case is from the Circuit Court of Appeals from the Seventh Circuit.[5] Speaking for the court, Judge Kerner writes:

"The Fair Labor Standards Act is remedial and must be given a liberal construction with its manifest intent and purpose in view. One of its objectives is to fix standards of hours and wages of those engaged in handling goods or producing goods for interstate commerce. It must not be applied in a narrow, grudging manner."[6]

Adopting this as the norm of construction, the courts have interpreted the meaning of the word "commerce" broadly. So doing, they have given expression to a policy which they have followed with great consistency, a policy which cannot be understood if we try to reconcile the decisions which interpret the commerce clause,[7] regardless of the objectives of the statute by which the regulation is achieved.

To be more explicit: The teaching of the cases is that the power of the Congress to control commerce—a plenary power—is *not* the same in every field. If we examine decisions which interpret the Sherman Anti-Trust Act,[8] we find in late decisions a repudiation of the doctrine of stoppage. The older cases would indicate that when goods came to rest in a state, they ceased to be in "the flow" of interstate commerce, and could no longer be reached by the Act. But in more recent years, the Supreme Court has held that certain practices may be in violation of the Act, although the commodities to which they related and which originated in interstate commerce had come to rest. Following these decisions, I ruled in 1942, that when a group of grocers combined to set prices for foods and groceries transported in interstate commerce—such as canned milk, baking powder, and the like—the price fixing affected commodities in interstate commerce and was in violation of the law, although the prices took effect after the merchandise reached the grocer's shelves.[9]

On the other hand, in the realm of state taxation and regulation of local activities, the courts take an entirely different view. Illustrative is the case arising in California, where the Southern Pacific Company had transported certain rails, equipment, machinery, tools and office supplies to California, which were not intended for use in that state, but in other Southwestern States in which the Company was engaged

4 Walling v. Rutherford Fruit Corporation, 1946, 10 Cir., 156 F.2d 513, 516.

5 Walling v. National Ice & Fuel Corporation, 1946, 7 Cir., 158 F.2d 28, 29.

6 Walling v. National Ice & Fuel Corporation, supra, 158 F.2d at page 29.

7 Constitution, Article I, Section 8, Clause 3.

8 15 U.S.C.A. § 1 et seq.

9 United States v. Food and Grocery Bureau of Southern California, 1942, D. C.Cal., 43 F.Supp. 966, 974. And see my opinion in United States v. San Francisco Electrical Contractors Ass'n, 1944, D.C.Cal., 57 F.Supp. 57. In an opinion filed on the day on which the proof of this opinion reached me, June 7, 1948, I treat fully this trend in anti-trust cases in the light of the most recent decisions. (See, United States v. Standard Oil Co. of California et al., No. 6159-Y to be published later in Fed.Supp.)

in the operation of railroads. The Supreme Court held that, under the Use Tax Act, the State of California could tax these materials while they remained in the State.[10]

A similar situation arose in a three-judge case in which I sat some years ago. This was a raisin control case, which involved the question whether the State of California, under its Agricultural Prorate Act of 1933, as amended, could establish a method of control before the raisins were processed. It appeared that ninety per cent of the raisins consumed in the United States are grown and processed in California, and that the processing was for interstate commerce chiefly.

Two members of the court felt that this was an interference with interstate commerce. I wrote a dissenting opinion, in which I applied the criterion just discussed, namely, that there is no absolute and all-inclusive definition of what is, and what is not, interstate commerce, but that all definitions are relative, and limited by the scope of particular statutory regulations or restrictions. I expressed the view that during the period of stemming and cleaning the raisins and packing them into boxes,—i. e., during the *processing,* which took place from the time they left the grower's vineyard, went through the processing plant, the packer's establishment, and into interstate commerce, the State of California had the right to regulate the industry and control marketing and distribution, although the product was intended chiefly for interstate commerce.[11] The Supreme Court upheld my view.[12]

In a case involving the California Caravan Act of 1937, which regulated the operation of automobiles by caravans from other states, I took the view that the State

of California had the power to determine the conditions under which automobiles were brought into the state, and that a tax to be paid by persons using our roads, not for ordinary transportation, but for business and commercial purposes, was valid.[13]

In construing the Fair Labor Standards Act of 1938, and the Portal-to-Portal Act of 1947, we must bear these principles in mind.

Section 203, Title 29 U.S.C.A., gives the definition of "commerce". I quote subdivision (b) of that section:

" 'Commerce' means trade, commerce, transportation, transmission, communication among the several States or from any State to any place outside thereof."

The Supreme Court, in a leading case[14] interpreting the word "commerce" in this Section and the provision contained elsewhere in the Act, which make the statute applicable to employees engaged "in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof,"[15] has ruled that it is not so much the character of the employer's business as that of the employees, which determines the applicability of the Act. The Court said:

"The petitioners assert, however, that the building industry of which they are part is purely local in nature and that the Act does not apply where the employer is not himself engaged in an industry partaking of interstate commerce. But the provisions of the Act expressly make its application dependent upon the character of the employees' activities. And, in any event, to the extent that his employees are 'engaged in commerce or in the production of goods for commerce,' the employer is himself so engaged. Nor can we find in the Act, as

---

[10] Southern Pac. Co. v. Gallagher, 1939, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586. And see, Pacific Telephone & Telegraph Co. v. Gallagher, 1939, 306 U.S. 182, 59 S. Ct. 396, 83 L.Ed. 595; California v. Thompson, 1941, 313 U.S. 109, 113, 61 S.Ct. 930, 85 L.Ed. 1219; Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 569, 63 S.Ct. 332, 87 L.Ed. 460.

[11] Brown v. Park, 1941, D.C.Cal., 39 F. Supp. 895, 902.

[12] Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315.

[13] Paul Gray, Inc. v. Ingels, 1938, D.C. Cal., 23 F.Supp. 946, 950. And see, Clark v. Paul Gray, Inc., 1939, 306 U. S. 583, 59 S.Ct. 744, 83 L.Ed. 1001, sustaining the position taken in the dissent.

[14] Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

[15] 29 U.S.C.A. § 203(j).

do the petitioners, any requirement that employees must themselves participate in the physical process of the making of the goods before they can be regarded as engaged in their production." [16]

One of the defenses urged in this case is that the defendant is not engaged in interstate commerce. This contention, which was stressed eloquently at the trial, and in the trial memorandum filed by the defendant, seems grounded chiefly on the language of the Supreme Court in Northern Pacific Ry. Co. v. United States.[17] That was an action brought under the Tucker Act, 28 U.S.C.A. § 41(20). The question before the court was whether the railroad was entitled to commercial rates, or the land grant rates which it received for the transportation of government property. The Act which governed was known as the Transportation Act of 1940.[18] The railroad company questioned whether the property, being the property of the United States, and having been shipped to Army and Navy officers in four or five instances, and in the last instance to the Civil Aeronautics Authority, was "military or naval" property, and whether it was moving for "military or naval" use. Mr. Justice Douglas, speaking for an unanimous court, said:

"An army and navy on foreign shores or in foreign waters cannot live and fight without a supply fleet in their support. The agency, whether civil or military, which performs that function is serving the armed forces. The property which it employs in that service is military or naval property, serving a military or naval function. * * * Military or naval property may move for civil use, as where army or navy surplus supplies are shipped for sale to the public. But in general the use to which the property is to be put is the controlling test of its military or naval character. Pencils as well as rifles may be military property. Indeed, the nature of modern war, its multifarious aspects, the requirements of the men and women who constitute the armed forces and their adjuncts, give military or naval property such a broad sweep as to include almost any type of property. More than articles actually used by military or naval personnel in combat are included. Military or naval use includes all property consumed by the armed forces or by their adjuncts, all property which they use to further their projects, all property which serves their many needs or wants in training or preparation for war, in combat, in maintaining them at home or abroad, in their occupation after victory is won. It is the relation of the shipment to the military or naval effort that is controlling under § 321(a)." [19]

Here again we find that the Supreme Court followed the norm to which I have referred, and interpreted the words contained in the Transportation Act with reference to the particular object sought to be attained. And, as this was a claim against the Government for additional compensation, in the face of a statute which limited the compensation for the railroads which had received without cost to them, large land grants from the Government, the Court interpreted the statute so as to cover materials which found their ultimate destination with the Army and Navy. Thus, the court considered the purpose to be attained by the statute, in order to determine its applicability to particular circumstances. Hence, it appears to me that this decision must be delimited in the way here indicated, and cannot be considered authority in a case like the present one, which arises under a statute, the object of which is to abolish sub-standard wages in such industries as the Congress can reach under the commerce clause.

But we are not without direct authority for a holding that activities of the type here involved—namely, the construction by contractors of ships to be used in the transportation of cargoes, or anything else which the government should choose to transport in them, and destined to be used on the high seas, between the United States and a foreign country, or in coastwise transporta-

---

[16] Kirschbaum Co. v. Walling, supra, 316 U.S. at page 524, 62 S.Ct. at page 1120, 86 L.Ed. 1638.

[17] Northern P. R. Co. v. United States, 1947, 330 U.S. 248, 67 S.Ct. 747, 750, 91 L.Ed. 876.

[18] 49 U.S.C.A. § 65(a).

[19] Northern P. R. Co. v. United States, supra, 330 U.S. at pages 254, 255, 67 S. Ct. at pages 750, 751, 91 L.Ed. 876.

tion between the various coastal States, both here and on the Atlantic Ocean—are within the Act. In Adams v. St. Johns River Shipbuilding Co.,[20] the Court had before it the question whether employees of a private corporation, engaged, as independent contractors, in constructing for the United States Maritime Commission, Liberty Ships and tankers used to transport supplies to the Armed Forces abroad, but adaptable to civilian use, were engaged in the production of goods for commerce within the Fair Labor Standards Act. Judge Strum wrote:

"The Court finds that the employees engaged in the construction of both Liberty ships and tankers were engaged in 'the production of goods for commerce,' and that they were the employees of a private industrial corporation and not of the United States, so that, unless exempt for other reasons, they are within the coverage of the Act." [21]

The case went to the Court of Appeals for the Fifth Circuit. In an opinion written by Judge Sibley, and concurred in by the whole court of six members, the ruling was affirmed. And, as that court is composed of such outstanding judges as Sibley, Holmes, Hutcheson, McCord, Waller and Lee, I do not hesitate to adopt its reasoning. Speaking of the ships, Judge Sibley said:

"The petition alleges the Company was engaged in commerce, but it is well settled that not the employer's business, but the employee's work, is what counts. So says the Act, Sect. 7, 29 U.S.C.A. § 207. Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

"These employees were found to be employed in building ships and doing work essential to that end. Ships are by the definition of the statute included among 'goods.' Sec. 3(i), 29 U.S.C.A. § 203(i). Ships which are to be used as vehicles of interstate and foreign transportation are fairly 'goods for commerce,' for the statute, Sec. 3(b), and the Constitution include transportation as commerce. There would be no difficulty save for the fact of war, declared in December, 1941. Yet war does not stop all commerce nor suspend the laws regulating commerce. Goods, including ships may still be produced for commerce, and we think the Liberty Ships were so produced. The Maritime Commission, normally a peace time agency, made the contracts for these, the contracts reciting as their authority Act No. 247, Aug. 25, 1941, of the 77th Congress, 55 Stat. 669, 681, authorizing it to contract for 'merchant vessels of such type, size, and speed as (it) may determine to be useful for carrying on the commerce of the United States and suitable for conversion into naval or military auxiliaries.' The contracts state that the vessels ordered are such vessels. The evidence shows no different purpose in producing them. The Interpretive Bulletin No. 5 of the Wage and Hour Division of the Department of Labor issued in December, 1938, revised November, 1939, state: 'Employees are engaged in the production of goods for commerce where the employer intends or hopes or has reason to believe that the goods or any unsegregated portion of them will move in interstate commerce. * * * The facts at the time the goods are being produced determine whether an employee is engaged in the production of goods for commerce, and not any subsequent act of his employer, or some third party.' Thus the agreed purpose of these ships was primarily commerce, with only a possibility of utilizing them later for war. As the intentions of the owner and builder stood at the time of construction they appear to have been ships produced for commerce." [22]

A late case from the Circuit Court of Appeals for the Fourth Circuit is indicative of the trend in interpreting this statute. I quote:

"There is no basis in the decided cases for the conclusion that employees who handle out-of-state goods are not engaged in commerce in the sense of the Fair Labor Standards Act unless the flow of the interstate movement continues until final delivery to the importer's customers.

---

[20] Adams v. St. Johns River Shipbuilding Co., 1947, D.C., Fla., 69 F.Supp. 989.

[21] Adams v. St. Johns River Shipbuilding Co., supra, 69 F.Supp. at page 991.

[22] St. Johns River Shipbuilding Co. v. Adams, 1947, 5 Cir., 164 F.2d 1012, at page 1014.

"It has been held under other statutes and in other relations that the various steps in the procuring of out-of-state goods, such as the negotiation therefor and the buying and selling thereof for shipment from one state to another, constitute interstate commerce. Real Silk Hosiery Mills v. Portland, 268 U.S. 325, 335, 45 S.Ct. 525, 69 L.Ed. 982; Federal Trade Comm. v. Pacific Paper Ass'n, 273 U.S. 52, 64, 47 S.Ct. 255, 71 L. Ed. 534; Furst v. Brewster, 282 U.S. 493, 497, 498, 51 S.Ct. 295, 75 L.Ed. 478. Likewise it is established that the unloading of interstate shipments is an activity in interstate commerce. Baltimore & O. S. W. R. R. v. Burtch, 263 U.S. 540, 544, 44 S.Ct. 165, 68 L.Ed. 433; Puget Sound Co. v. State Tax Comm., 302 U.S. 90, 92, 58 S.Ct. 72, 82 L.Ed. 68; Union Stock Yard Co. v. United States, 308 U.S. 213, 219, 60 S.Ct. 193, 84 L.Ed. 198; Joseph v. Carter & W. Stevedoring Co., [330 U.S. 422], 67 S. Ct. 815, 817, [91 L.Ed. 993]. It is true that it has been said that decisions dealing with various assertions of state or federal power in the commerce field are not particularly helpful in determining the scope of the Fair Labor Standards Act. Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 521, 62 S.Ct. 1116, 86 L.Ed. 1638; but this pronouncement was made to enlarge rather than restrict the field in which the statute shall be effective, for it has also been said that the clear purpose of the Act was to extend federal control in this field throughout the farthest reaches of interstate commerce, and that once goods have entered the channels of interstate commerce, control over the entire movement of them is preserved until their interstate journey is ended. Walling v. Jacksonville Paper Co., 317 U.S. 564, 567, 568, 63 S.Ct. 332, 87 L. Ed. 460." [23]

To apply these principles to the activities of the defendant in this case:

On October 28, 1945, the defendant was engaged in constructing cargo ships and assault troop ships for the United States Maritime Commission. The buildings and facilities of the defendant's shipyards, at Terminal Island, California, were owned by the Commission. All parts, materials, and supplies used in the construction of ships were also owned by the Commission. The Commission had the right to hire or discharge employees, approved all wage rates and was a party to all negotiations between the shipyard operators and the unions representing the employees. The Commission had representatives in the shipyards to watch the labor conditions and wage payments made by the shipyard operators.

While the defendant constructed ships, under contract with the Commission, the contractor, and it alone, built the ships. And while the Commission had representatives to watch what was being done, *ultimately,* the responsibility was upon the defendant contractor, who was held responsible for the construction and delivery of the ships.

Under the circumstances, I am of the view that the employees of the defendant are covered by the Act, as being engaged in the production of goods for interstate commerce, under subdivisions (b), (i), and (j) of Section 203 of Title 29 U.S.C.A.

II
The Portal-to-Portal Act is Constitutional

What has just been said was necessary as an approach to the problem before the Court. Specifically, I am to decide whether the plaintiffs are entitled to additional compensation under the Portal-to-Portal Act of 1947. The action is governed by Section 2 of the Act, relating to existing claims, which is codified as Section 252 of Title 29 U.S.C.A., and reads:

"(a) No employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act (in any action or proceeding commenced prior to or on or after May 14, 1947), on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any activity of an employee engaged in prior to May 14, 1947, except an activity which was compensable by either—

"(1) an express provision of a written or non-written contract in effect, at the time of such activity, between such employee,

[23] McComb v. Herlihy, 1947, 4 Cir., 161 F.2d 568, 570, 571.

his agent, or collective-bargaining representative and his employer; or

"(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee was employed, covering such activity, not inconsistent with a written or non-written contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.

"(b) For the purposes of subsection (a) of this section, an activity shall be considered as compensable under such contract provision or such custom or practice only when it was engaged in during the portion of the day with respect to which it was so made compensable.

"(c) In the application of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act of 1938, as amended, of the Walsh-Healey Act, or of the Bacon-Davis Act, in determining the time for which an employer employed an employee there shall be counted all that time, but only that time, during which the employee engaged in activities which were compensable within the meaning of subsections (a) and (b) of this section.

"(d) No court of the United States, of any State, Territory, or possession of the United States, or of the District of Columbia, shall have jurisdiction of any action or proceeding, whether instituted prior to or on or after May 14, 1947, to enforce liability or impose punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, under the Walsh-Healey Act, or under the Bacon-Davis Act, to the extent that such action or proceeding seeks to enforce any liability or impose any punishment with respect to an activity which was not compensable under subsections (a) and (b) of this section.

"(e) No cause of action based on unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, which accrued prior to May 14, 1947, or any interest in such cause of action, shall hereafter be assignable, in whole or in part, to the extent that such cause of action is based on an activity which was not compensable within the meaning of subsections (a) and (b) of this section."

The history of the Act is well known. It followed the announcement by the Supreme Court of the United States of the decision in Anderson v. Mt. Clemens Pottery Co.[24]

In that case, the court held that time spent by the employees in walking long distances in the plant to their places of work, was compensable under the Act, unless it was so negligible as to come within the de minimis rule, which says that a court is not concerned with trifles.

I have stated repeatedly that this law is a valid enactment. In fact, when counsel for various labor groups began to urge the unconstitutionality of it, I expressed the view that it was a disservice to the cause of labor to insist that the Congress, which had conferred upon workmen a right which they did not have before, is without power to take it away.

I now state the basis for that conclusion. It is the very fundamental principle that the Constitution establishes only one court, —the Supreme Court of the United States. It declares that the judicial power shall consist of the Supreme Court and such inferior tribunals as the Congress shall, "from time to time ordain and establish."[25] The jurisdiction of the lower Federal Courts is, consequently, purely statutory. And while the Constitution decrees, generally, that the judicial power shall extend to certain cases, the Congress of the United States has never conferred upon the lower courts of the United States full constitutional jurisdiction.[26]

Mr. Justice Story, in an early case, decided in 1816, raised the question whether the Congress of the United States could

24 Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 66 S.Ct. 1187, 90 L. Ed. 1515.

25 United States Constitution, Article III, Section 1.

26 United States Constitution, Article III, Section 2.

deny the full jurisdiction.[27] But later decisions have held that the Congress is not called upon to confer full jurisdiction.[28] As a fact, it could give jurisdiction in diversity cases, regardless of the amount involved. But from the first Judiciary Act of 1789, to the present time, it has limited such jurisdiction to causes involving a minimal amount. Even as to causes arising under the Constitution and the laws of the United States, which are covered by Subdivision (1) (b) of Section 24 of the Judicial Code,[29] a jurisdictional minimum obtains.[30]

The departure of the courts from the earlier attitude, and the adoption of the present view that there is no compulsion on the part of the Congress to confer full jurisdiction is easily understood. Who is to compel the Congress to act? Could a court issue a mandate to the Congress of the United States ordering them to enact a certain law, and confer upon courts the full judicial power called for by the Constitution? Should they not obey, could the court compel obedience on the part of the Representative or Senator who declined to introduce such a bill, or the steering committee, or the rules committee? So we can see that when the courts, in the later cases, say that the Congress can withhold jurisdiction, they are adopting a view which is realistic, practical and consonant with the basic constitutional idea, that the Constitution, in the last analysis, merely lays down the scope of jurisdiction which the Congress of the United States may confer by appropriate legislation. And it is axiomatic and good constitutional doctrine that he who gives can take away. "The Lord gave, and the Lord hath taken away:" (Job 1:21)

The broadest statement of the scope of the power of the Congress over the jurisdiction of the lower courts is found in Kline v. Burke Construction Co.[31] written by Mr. Justice Sutherland. The problem before the court was whether the Federal Court, after acquiring jurisdiction of the subject matter of a case, could enjoin the parties from proceeding in a State court

---

[27] Martin v. Hunter's Lessee, 1816, 1 Wheat. 304, 4 L.Ed. 97.

[28] Kline v. Burke Const. Co., 1922, 260 U.S. 226, 43 L.Ed. 79, 67 L.Ed. 226, 24 A.L.R. 1077; Gillis v. California, 1934, 293 U.S. 62, 66, 55 S.Ct. 4, 79 L.Ed. 199; Ætna Life Ins. Co. v. Haworth, 1937, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000; Lockerty v. Phillips, 1943, 319 U.S. 182, 187, 188, 63 S.Ct. 1019, 87 L.Ed. 1339; Cook v. United States, 1940, 5 Cir., 115 F.2d 463; People v. Bruce, 1940, 9 Cir., 129 F.2d 421, 423.

The language of the Court in Aetna Life Insurance Co. v. Haworth, supra, 300 U.S. at page 240, 57 S.Ct. at page 463, 81 L.Ed. 617, 108 A.L.R. 1000, is very pertinent:

"In providing remedies and defining procedure in relation to cases and controversies in the constitutional sense the Congress is acting within its delegated power over the jurisdiction of the federal courts which the Congress is authorized to establish. Turner v. Bank of North America, 4 Dall. 8, 10, 1 L.Ed. 718; Stevenson v. Fain, 195 U.S. 165, 167, 25 S.Ct. 6, 49 L.Ed. 142; Kline v. Burke Construction Co., 260 U.S. 226, 234, 43 S.Ct. 79, 82, 67 L.Ed. 226, 24 A.L.R. 1077. Exercising this control of practice and procedure the Congress is not confined to traditional forms or traditional remedies. The judiciary clause of the Constitution 'did not crystallize into changeless form the procedure of 1789 as the only possible means for presenting a case or controversy otherwise cognizable by the federal courts.' Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U.S. 249, 264, 53 S.Ct. 345, 348, 77 L.Ed. 730, 87 A.L.R. 1191. In dealing with methods within its sphere of remedial action, the Congress may create and improve as well as abolish or restrict." (Emphasis added)

And see: Central States Co-ops. v. Watson Bros. Transp. Co., 1947, 7 Cir., 165 F.2d 392, 395, 396.

[29] 28 U.S.C.A. § 41(1) (b).

[30] McNutt v. General Motors Acceptance Corporation, 1936, 298 U.S. 178, 188, 189, 56 S.Ct. 780, 80 L.Ed. 1135; KVOS, Inc. v. Associated Press, 1936, 299 U.S. 269, 277, 278, 57 S.Ct. 197, 81 L.Ed. 183; Clark v. Paul Gray, Inc., 1939, 306 U.S. 583, 588–590, 59 S.Ct. 744, 83 L.Ed. 1001; Gibbs v. Buck, 1939, 307 U.S. 66, 68–72, 59 S.Ct. 725, 83 L.Ed. 1111; Thomson v. Gaskill, 1942, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951; and see, opinions in Dewar v. Brooks, 1936, D.C., Nev., 16 F.Supp. 636, 638; and Allen v. Clark, 1938, D.C., Cal., 22 F.Supp. 898.

[31] Kline v. Burke Const. Co., 1922, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077.

of concurrent jurisdiction. The Court said:

"Only the jurisdiction of the Supreme Court is derived directly from the Constitution. Every other court created by the general government derives its jurisdiction wholly from the authority of Congress. That body may give, withhold or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution. Turner v. Bank of North America, 4 Dall. 8, 10, 1 L.Ed. 718; United States v. Hudson & Goodwin, 7 Cranch 32, 3 L.Ed. 259; Sheldon v. Sill, 8 How. 441, 448, 12 L.Ed. 1147; Stevenson v. Fain, 195 U.S. 165 [25 S.Ct. 6, 49 L.Ed. 142]. The Constitution simply gives to the inferior courts the capacity to · take jurisdiction in the enumerated cases, but it requires an act of Congress to confer it. Mayor v. Cooper, 6 Wall. 247, 252, 18 L.Ed. 851. And the jurisdiction having been conferred may, at the will of Congress, be taken away in whole or in part; and if withdrawn without a saving clause all pending cases though cognizable when commenced must fall. Assessors v. Osbornes, 9 Wall. 567, 575, 19 L.Ed. 748. A right which thus comes into existence only by virtue of an act of Congress, and which may be withdrawn by an act of Congress after its exercise has begun, cannot well be described as a constitutional right."[32]

This case has been cited and followed in later cases.[33] In a case[34] which interpreted the Norris-La Guardia Act,[35] which limited the power of the courts to issue injunctions in labor disputes, the Supreme Court said:

*"There can be no question of the power of Congress thus to define and limit the jurisdiction of the inferior courts of the United States."*[36] (Emphasis added)

In Cook v. United States,[37] the court, in defining the scope of the Tucker Act,[38] which allows recovery on certain claims against the United States, by a suit brought in the Court of Claims or in the District Courts, used this language:

"The federal courts, other than the Supreme Court, do not derive their jurisdiction from the Constitution of the United States, but exercise only such powers as Congress, within constitutional limits, confers upon them. So long as it does not expand that jurisdiction beyond such limitations, the Congress may give, withhold, or restrict that jurisdiction as it sees fit. Courts created by statute must look to the statute as the warrant of their authority, and even an implied repeal of it leaves the courts powerless to decide pending cases."[39]

To the same effect is People v. Bruce,[40] in which Judge Wilbur, writing the opinion, states:

"It is fundamental that federal courts, other than the Supreme Court, have only such jurisdiction as Congress has prescribed."[41]

Among the cases which have arisen under the Portal-to-Portal Act and in which the courts have held it constitutional, I refer to two of the latest. In Burfeind v. Eagle-Picher Co. of Texas,[42] Judge Atwell, in passing on a motion to dismiss the action, refers to the suggestion of the plaintiffs in the action that the Act is unconstitutional and gives this answer:

"The suggestion, by the plaintiffs, of the unconstitutionality of the Act is not supported by any voice from that great instrument. The Congress has the unquestioned right to regulate the jurisdiction of constitutionally-born inferior courts. It may withdraw the right of such courts to

---

[32] Kline v. Burke Construction Co., supra, 260 U.S. at page 234, 43 S.Ct. at page 82, 67 L.Ed. 226, 24 A.L.R. 1077.

[33] Aetna Life Insurance Co. v. Haworth, 1937, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000; Lauf v. E. G. Shinner & Co., 1938, 303 U.S. 323, 330, 58 S.Ct. 578, 82 L.Ed. 872. See other cases cited in Noted 28.

[34] Lauf v. E. G. Shinner & Co., 1938, 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872.

[35] 29 U.S.C.A. § 101 et seq.

[36] Lauf v. E. G. Shinner & Co., supra,

303 U.S. at page 330, 58 S.Ct. at page 581, 582, 82 L.Ed. 872.

[37] Cook v. United States, 1940, 5 Cir., 115 F.2d 463, 464.

[38] 28 U.S.C.A. § 41(20).

[39] Cook v. United States, 1940, 5 Cir., 115 F.2d 463, 464, 465.

[40] People v. Bruce, 1942, 9 Cir., 129 F.2d 421.

[41] People v. Bruce, 9 Cir., supra, 129 F. 2d at page 423.

[42] Burfeind v. Eagle-Picher Co. of Texas, 1947, D.C.Texas, 71 F.Supp. 929.

proceed with suits based on rights created by national legislation. Kline v. Burke, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077. It also has the power to withdraw from a state court the right to adjudicate causes out of federal statutes. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892. Claims for minimum wages, overtime compensation, liquidated damages, and penalties, are not vested property rights within the protection of the Fifth Amendment. They are simply statutory rights and may be withdrawn by the Congress at any time before ripening into final judgment."[43]

In Boehle v. Electric Metallurgical Co.,[44] Judge McColloch, while expressing his lack of sympathy with special legislation which restricts the jurisdiction of the District Courts, considers the constitutionality of the Act beyond question:

"In short, jurisdiction of the courts should not be a legislative football. Despite this view, I do not see how a Federal District Judge could hold this most recent tampering with jurisdiction to be unconstitutional, while at the same time upholding the constitutionality of the Norris-LaGuardia Act, as is required by countless decisions over the last fifteen years, including decisions of the Supreme Court."[45]

### III

### The Facts in the Case in the Light of the Portal-to-Portal Act

(A) *The Scope of the Portal-to-Portal Act.*

What has just been said disposes of the defense that the employees are not covered by the Act. As a part of the discussion, I touched on the constitutionality of the Act. The question being germane to the subject, and having been raised on one of the motions to dismiss, I have referred to the principles on which my conclusion that the enactment is constitutional is based.[46]

Now we come to the specific problem in the case, which is the application of Section 2 of the Act.[47] The object of this section is to do away with the liabilities and penalties provided in the Fair Labor Standards Act. flowing from the failure of an employer to pay the employees either wages or overtime. This is achieved by providing that there shall be no liability or punishment, unless the work for which claim is made is "an activity which [is] compensable" by either an express provision or a written or unwritten contract, or a custom or practice in effect at the time of the activity, which does not conflict with the contract.

The same section, in subdivision (d),[48] deprives all courts of jurisdiction to entertain any action to enforce any liability.

The Conference Report on the measure throws a clear light on the legislative intent. In a portion entitled "Clarifying Provisions," the Report says:

### "Clarifying Provisions

"The conference agreement (section 2 (b) ) contains a provision not stated expressly in either bill, that an activity shall be considered as compensable under the above referred to contract provision or custom or practice only when it was engaged in during the portion of the day with respect to which it was so made compensable. Under this provision, for example, if under the contract provision or custom or practice an activity was compensable only when engaged in between 8 and 5 o'clock but was not compensable when en-

---

[43] Burfeind v. Eagle-Picher Co. of Texas, supra, 71 F.Supp. at page 931.

[44] Boehle v. Electrical Metallurgical Co., 1947, D.C. Oregon, 72 F.Supp. 21.

[45] Boehle v. Electrical Metallurgical Co., supra, 72 F.Supp. at page 21.

[46] To the cases given in preceding notes (28, 33, 37, 40, 42, and 44) the following may be added: Norman v. Baltimore & O. R. Co., 1935, 294 U.S. 240, 306–311, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; Lockerty v. Phillips, 1943, 319 U. S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339. And see my opinion in United States v. Standard Oil Co. of California, 1937, D. C., Calif., 21 F.Supp. 645, 661.

Among the latest cases sustaining the Act are: Story v. Todd Houston Shipbuilding Corporation, 1947, D.C., Tex., 72 F.Supp. 690, 694; Johnson v. Park City Consol. Mines Co., 1947, D.C., Mo., 73 F.Supp. 852, 856, 857; Holland v. General Motors Corporation, 1947, D.C.N.Y., 75 F.Supp. 274. For a critical analysis of some of these cases, see, Constitutionality of The Portal-To-Portal Act, 47 Columbia Law Review, 1947, pp. 1010 et seq.

[47] 29 U.S.C.A. § 252.

[48] 29 U.S.C.A. § 252(d).

gaged in before 8 or after 5 o'clock, it will not be considered as compensable activity when engaged in before 8 or after 5 o'clock. So also, if·under the contract provision or custom or practice an activity was compensable during a certain portion of the regular workday but was not compensable when engaged in during other hours of the regular workday, it will not be compensable under the bill as agreed to in conference when engaged in during such other hours."[49]

The Wage and Hour Administrator, in an interpretation of this clause says:

"The provisions of section 2(a) (b) of the Portal Act differ from the corresponding provisions of section 4, relating to future claims, in that their scope is not confined to activities engaged in outside the workday proper, but extends to such activities engaged in at any time during the 24 hours of the day."[50]

So it is clear from this that the activities are not compensable unless they are made so by express provision of a written or unwritten contract, or a custom or practice in effect at the time.

Subdivision (c), which was added by the Committee, provides that in determining the time for which an employer employed an employee, only that time shall be counted during which the employee engaged in activities which were compensable within the meaning of subsections (a) and (b).[51]

(B) *The Facts in the Case.*

■ The facts in the case, considered in the light of these principles, lead me to the conclusion that there was a contract and a custom not inconsistent with it, which made compensable certain of the time of the 29 plaintiffs as to whom testimony was given.

Sections 4 and 5 of the contract with the Union, which is Plaintiff's Exhibit 1, and which define the hours of employment, overtime and shifts, from their explicit

wording, and the implications which they carry, show that it was the intention of the parties that any work done· beyond the 8-hour period as to two shifts and the 7-½ hour period as to a third shift—whether performed before or after the regular hours—and which was of the same nature as the work for which the employee was hired, and which he did during his regular shift, was to be compensated as overtime. They read:

"4. Hours of Employment and Overtime

"Forty (40) hours shall constitute a work week, eight (8) hours per day, five (5) days per week, Monday to Friday, inclusive, between the hours of 8 A.M. and 5 P.M., except that where, as to any locality or as to any plant of any Employer, existing traffic conditions render it desirable to start the day shift at an earlier hour, such starting time may, with agreement of the Employer affected and the local Metal Trades Council, be made earlier, but in no event earlier than seven (7) A.M. Overtime at the rate of one and one-half times the established hourly rate shall be paid for all work performed in excess of eight (8) hours per day and forty (40) hours per week. Since this agreement is based on the intent of six-day-per-week operation, all work performed on Saturdays shall be paid for at one and one-half times the established hourly rate. Overtime at double the established rate shall be paid for all work performed on Sundays and holidays. These provisions relative to overtime payment and for Saturday work shall be effective only during the period of National Emergency; provided, however, that this establishment of this emergency rate shall not ·be used as a subterfuge to defeat the double-time provisions for Saturday work which would be in effect were it not for the National Emergency.

"The provision for time and one-half for overtime and on Saturdays established for

49 93 Congressional Record, p. 4371. Speaking of the import of Subdivision (c) of Section 2 of the Act, 29 U.S.C.A. § 252(c), the Report says:

"This provision is in the nature of a clarifying statement * * * to make it clear that only such time will be counted for the purposes of applying the minimum wage and overtime compensation provi-

sions of the three acts, and that it therefore will not be possible by judicial or administrative interpretation to include other time which was not made compensable under the rules above stated." 93 Congressional Record, p. 4371.
50 12 Federal Register, 7667.
51 29 U.S.C.A. § 252(c).

the duration of the National Emergency shall automatically terminate whenever the President of the United States shall proclaim that such National Emergency no longer exists; thereafter, all overtime shall be computed on a double-time basis.

"Holidays shall be as recognized by local Metal Trades Councils. When a recognized holiday falls on Sunday, the day observed by the Council shall be considered as a holiday and paid for as such.

"5. Shift Work

"Shift work will be permitted in all classifications without restriction on the following basis:

"(a) The regular starting time of the day shift shall be at eight (8) A.M., except that where, as to any locality or as to any plant of any Employer, existing traffic conditions render it desirable to start the day shift at an earlier hour, such starting time may, with the agreement of the Employer affected and the local Metal Trades Council, be made earlier, but in no event earlier than seven (7) A.M.

"(b) The regularly established starting time of the day shift shall be recognized as the beginning of the twenty-four (24) hour work day period. When irregular or broken shifts are worked, overtime rates shall apply before the regular starting time and after the regular quitting time of the shift on which the Employee is regularly employed.

"(c) First or regular daylight shift: An eight and a half (8½) hour period less thirty minutes for meals on the employee's time. Pay for a full shift period shall be a sum equivalent to eight (8) times the regular hourly rate with no premium.

"Second Shift: An eight (8) hour period less thirty minutes for meals on employee's time. Pay for a full second shift period shall be a sum equivalent to eight (8) times the regular hourly rate plus ten per cent (10%)

"Third Shift: A seven and one-half (7½) hour period less thirty minutes for meals on employee's time. Pay for a full third shift period shall be a sum equivalent to eight (8) times the regular hourly rate plus fifteen per cent (15%).

"(d) For work on any shift less than the full shift period, pay shall be the corresponding proportionate part of the pay for the full shift period, provided such amount be not less than the minimum pay prescribed in Paragraph 10 hereof."

I believe that the evidence shows that the leadmen and foremen were required by their immediate superiors to be at the plant before their actual work day began, and that the refusal of any one of them to be so present would have resulted in his immediate discharge. The nature of the work of the foremen was such that it was necessary that they be present before the preceding shift had actually left the grounds, in order to consult with the foremen who preceded them about the condition of the work, and that, at the conclusion of the shift, they were required to stay overtime for similar consultations with the foremen who were to replace them, and who were to check the work on the shift which preceded and lay out the work on the one which was to follow.

The evidence proves that the leadmen were also required to be present before the actual work day began and after, for consultation with the foremen and the laying out of the work.

This work was not paid for. It is true that there was no direct promise to pay. But the contract with the Union implies a promise to pay for all work that is required to be done, either before or after the regular eight-hour period.

When to that we add the fact that there was such requirement, and the fact that there were, at various times, discussions between the leadmen and foremen and their immediate superiors, in which intimation was given that payment would be forthcoming, I believe that the Court can infer a promise to pay, although actual payment was not made.

This conclusion is strengthened by the fact that for a short period of time, a definite compensable period was actually established, which was, later, abandoned. We need not determine the reason for the discontinuance. There are several versions in the record. The workmen said that they were informed that there would

'be no further payments. One of the supervisory officers, who testified for the defendant, stated that the abandonment was at the behest of the workmen themselves, who felt that a specified 20-minute period before and after, even when reduced to eight or ten minutes,—was not desirable, as it interfered with their plans for transportation, which had to be definite, and on which they had acted for a period of years.

I think that, as a trier of facts, I am warranted in inferring that the establishment of the additional compensable period was a recognition that work had been done for which compensation was expected and impliedly promised, and should be paid for. And that its later discontinuance does not warrant a contrary inference.

As to many of the men who were leadmen, and especially as those in the foreman class, there is evidence showing not only their presence before the actual beginning of the shift, but that they actually punched their cards *in advance of the starting period*. As to others, the cards indicate that they were not punched until after this preliminary work had been done. We must rely on the statements of the men. For, in the main, they are not contradicted, and imply verity.

There remains the question: What time allowance should be made for the leadmen and foremen?

I believe that a 10-minute period, before and after—20 minutes altogether—is a reasonable average period to be allowed the 19 men as extra compensation.

■ Section 11 of the Act [52] amends the Fair Labor Standards Act, insofar as that Act allows the recovery of liquidated damages.

The provision for liquidated damages, in the original Act, as interpreted by the Courts, made the award of liquidated damages obligatory.[53]

The present section gives the Court discretion to disallow liquidated damages, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended." [54]

I am satisfied that we do not have here a wilful violation. The situation was one which developed fortuitously from the needs of the work. No one deliberately set out to impose additional duties upon the workmen, foremen or leadmen, only to decline to pay for them. There is evidence in the record that many attempts were made to secure full compensation. In the end, the Maritime Commission disallowed the establishment of a standard base for overtime for required added activities.

Under the circumstances, and in view of the testimony of the executives of the defendant that they not only did not order anyone, even the foremen, to be at work early and stay late, but that, in truth, they did not know that that practice had grown up, no liquidated damages should be allowed.

The recovery of the 19 men will, therefore, be limited to the actual wages due them under the contract with the Union, and under the Fair Labor Standards Act.

Having disposed of the matter as to the 19, I should give my reasons for not awarding any judgment to the other 10.

■ In brief, I am of the view that no one—be he ordinary worker, leadman or foreman—should recover for any lunch time which was not used. The evidence in the case shows that in most instances, when the workmen could not go to lunch at the regularly designated hour, they took time off for lunch at a later hour. There is no evidence that anyone, whether he had his lunch at the regular time or at another time, was ever told to return in less than

---

[52] 29 U.S.C.A. § 260.

[53] 29 U.S.C.A. § 216(b); Overnight Motor Transp. Co. v. Missel, 1942, 316 U. S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Seneca Coal & Coke Co., v. Lofton, 1943, 10 Cir., 136 F.2d 359, 363; Rigopoulos

v. Kervan, 1943, 2 Cir., 140 F.2d 506, 508, 151 A.L.R. 1126; Brooklyn Sav. Bank v. O'Neil, 1945, 324 U.S. 697, 706–713, 65 S. Ct. 895, 89 L.Ed. 1296.

[54] 29 U.S.C.A. § 260.

30 minutes, which the contract with the Union allowed for lunch on the employee's time.

There is no evidence that any person was interferred with at the time he had his lunch. To the contrary, it is clear that most of the men walked away from the place where they were working and took their usual time for lunch.

But conceding that some of the men, who could not have their lunch at the regular time, contented themselves—as most of us do, with a sandwich and a glass of milk—I do not think the court would be warranted in awarding to anyone who testified in this court, any time for lost lunch time, or for reduced lunch time. All claims of the 29 in that respect will, therefore, be disallowed.

I shall also disallow time for putting away tools or brushes. The evidence, proves that while it was a requirement that the workmen put away their tools and brushes—which were valuable—a five minute period was allowed for the purpose, by blowing a whistle five minutes before quitting time. This time was adequate to permit the gathering of the tools and their safe storage, or to clean the brushes, and put them in the place provided for their safekeeping.

I am impressed by the fact, testified to by one of the witnesses for the defendant, that before the institution of this five minute whistle period, and even afterwards, it was rather difficult to keep some persons from "jumping the gun," and attempting to leave the ships before the end of the period, and that guards had to be stationed to see that no one left the ships before actual quitting time.

Recovery will, therefore, be, as to each of the 19 plaintiffs in the class of leadmen or foreman, for 20 minutes, during the period of their employment, without any liquidated damages. The other persons who are in the class of the plaintiff Devine, shall take nothing, for the reasons already indicated.

The Court finds that the plaintiffs are entitled to recover attorneys' fees, but, in view of the fact that the actual amount of the recovery cannot be determined until counsel have taken an accounting, which they have agreed to do, the Court will defer the determination of the amount to the time when the findings and judgment are actually signed by the Court.

The attorneys for the plaintiffs are directed to prepare findings and judgment in the amounts to be shown by the accounting, all in accordance with Subdivision (h) of Local Rule 7.[55]

---

[55] Although Judge Duncan, in Conwell v. Central Missouri Telephone Co., 1947, D.C.Mo., 74 F.Supp. 542, 544, 545, was dealing *not with facts* proved at a trial, but with the allegations of a complaint, his views as to the type of activities which justify recovery are in harmony with those here expressed. He says:

"It is difficult to conclude that the Congress of the United States intended to deny jurisdiction of the Court over legitimate claims of employees who had actually worked many hours in excess of 40 hours permitted by the Fair Labor Standards Act. Nowhere was it insisted during the consideration of the Act that such claims were unfair or unjust or outside the scope of the Fair Labor Standards Act, nor were there any expressions indicating a desire to destroy any such claims, or the jurisdiction of the Court with respect thereto except insofar as it was necessary to deny jurisdiction with respect to the portal-to-portal pay cases which were not seeking compensation for actual services rendered for productive labor, but for traveling and waiting time and for other activities outside actual productive activities.

"Section 207 of the Fair Labor Standards Act provides that:

" 'No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce * * * for a workweek longer than 40 hours after the expiration of the second year from such date, (1938) unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.'

"In construing this section the Courts have said that any contract between employer and employee subject to the Fair Labor Standards Act inconsistent with its provisions is illegal and not binding upon employer or employee. * * *

"Plaintiff alleges that she was employed in interstate commerce at 40 cents per hour, and that *she was required to and*

*did work 66 hours per week and that she was not paid one and one-half times the regular hourly rate of 40 cents.*

"As there could have been no contract of employment between plaintiff and defendant which did not include the mandatory provisions of Section 207, supra, as to payment of overtime for hours in excess of 40 hours per week, it would seem that these allegations imply, if not clearly express, an agreement to pay in compliance with the statute and are sufficient to sustain the action under the limitations of the Portal-to-Portal Act." (Emphasis added)