NORTHERN PACIFIC RAILWAY CO. *v.* UNITED STATES.

No. 400.   Argued January 13, 1947.—Decided March 3, 1947.

*Lorenzo B. da Ponte* argued the cause for petitioner. With him on the brief was *Marcellus L. Countryman, Jr.*

*Robert L. Werner* argued the cause for the United States. With him on the brief were *Acting Solicitor Gen-*

*eral Washington, Assistant Attorney General Sonnett, Philip Elman, Paul A. Sweeney, Oscar H. Davis* and *Hubert H. Margolies.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a companion case to *United States* v. *Powell* and *United States* v. *Atlantic Coast Line R. Co.,* decided this day, *ante,* p. 238. This case, like those, involves the construction of the provision of § 321 (a) of the Transportation Act of 1940 which entitles "military or naval property of the United States moving for military or naval and not for civil use" to land-grant rates. Petitioner was a land-grant road, 13 Stat. 365, 370, and for years carried government property at land-grant rates. 43 Stat. 477, 486, 10 U. S. C. § 1375. It qualified to receive the higher rates authorized by § 321 (a) of the Transportation Act of 1940 by the timely filing of the required release of land-grant claims pursuant to § 321 (b) of the Act.[1]

The shipments in controversy were made over petitioner's railroad on government bills of lading in 1941, 1942, and 1943. They were admittedly government property at the time of carriage. Petitioner submitted its bills to the Government at the published commercial tariff rates. The United States, claiming that under § 321 (a) of the Transportation Act each shipment was entitled to move at land-grant rates, deducted the difference between the commercial rates and the land-grant rates. Petitioner thereupon brought this suit under the Tucker Act to recover the deducted sums. The District Court entered judgment for the United States on the

---

[1] This release was followed by a settlement of the litigation before this Court in *United States* v. *Northern Pacific R. Co.,* 311 U. S. 317. See *United States* v. *Northern Pacific R. Co.,* 41 F. Supp. 273; S. Doc. No. 48, 77th Cong., 1st Sess.

claims here involved. 64 F. Supp. 1. The Circuit Court of Appeals affirmed. 156 F. 2d 346. The case is here on certiorari.

The shipments involved five types of property:

*Copper cable.*—Copper cable was transported to Tacoma, Wash., for use in the installation of degaussing equipment (a defense against magnetic mines) on a cargo vessel being so built that it might readily be converted into a military or naval auxiliary. The work was done by a contractor under contract with the Maritime Commission. The degaussing specifications were furnished by the Navy, which also furnished the equipment and bore the cost. The vessel was delivered in 1941 and was operated as directed by the Maritime Commission or the War Shipping Administration. Whether it operated as a cargo vessel or as a military or naval auxiliary does not appear.

*Lumber for construction of munitions plant.*—In 1942 the Twin Cities Ordnance Plant was being constructed in Minnesota by contractors under the supervision of the Army. The plant was government owned and Army sponsored. Army officers were procuring agents for the lumber used in the construction. Petitioner transported lumber for use in the construction. The plant was completed in 1943 and manufactured ammunition for the armed forces.

*Lumber for construction of Marine Corps pontons.*—Petitioner in 1943 carried fir lumber to a plant in Minnesota to be treated, kiln-dried, milled, and manufactured by a contractor into parts of demountable floating bridges required to move military personnel and war vehicles across water barriers. The construction was under a contract with the Marine Corps. The manufactured product was either shipped overseas in connection with military or naval operations or was used in connection with the training of combat engineers.

*Bowling alleys for Dutch Harbor.*—Petitioner moved bowling alley equipment to Seattle, Washington, for reshipment to the Naval Air Base, Dutch Harbor, Alaska. The Navy had entered into a contract for the construction of an air base at Dutch Harbor on public land reserved for Navy use. The purchase and installation of the bowling alleys were pursuant to that contract and were approved by the Navy officer who had supervision and control of the construction program. The recreational facilities, which included the bowling alleys, were planned for initial use by the civilian construction crew and then, when construction work was ended, by the Navy. But in fact they were used only by members of the armed forces.

*Liquid paving asphalt for Cold Bay, Alaska, airport.*— In 1942 petitioner moved liquid paving asphalt to Seattle, Washington, for reshipment to Alaska. The asphalt was for use in constructing runways at an airport at Cold Bay under a program of the Civil Aeronautics Authority approved by a joint cabinet board as being necessary for the national defense. Work was commenced by a civilian contractor and, after the shipment had moved, was taken over by the Army which thereafter had full control of the field.

In four of the above instances the property was consigned to an army or navy officer; in the fifth, the shipment of liquid paving asphalt, the Civil Aeronautics Authority was the consignee. And as we have said, the property in each case was at the time of shipment property of the United States. The question remains whether within the meaning of § 321 (a) it was "military or naval" property and, if so, whether it was "moving for military or naval" use.

There is a suggestion that since the shipment of asphalt was to a civilian agency, the Civil Aeronautics Authority, it was not "military or naval" property. The theory is

that "military or naval" property means only property shipped by or under control of the Army or Navy.

We see no merit in that suggestion. Section 321 (a) makes no reference to specific agencies or departments of government. The fact that the War or Navy Department does the procurement might, of course, carry special weight or be decisive in close cases. But it is well known that procurement of military supplies or war material is often handled by agencies other than the War and Navy Departments. Procurement of cargo and transport vessels by the Maritime Commission is an outstanding example. See Merchant Marine Act of 1936, § 902, 49 Stat. 2015–2016, as amended, 46 U. S. C. § 1242. And shortly before the Transportation Act of 1940 was enacted, Congress by the Act of June 25, 1940, 54 Stat. 572, 573–574, authorized the Reconstruction Finance Corporation to create subsidiary corporations to purchase and produce equipment, supplies, and machinery for the manufacture of arms, ammunition, and implements of war. And later that Act was amended to enable those corporations to purchase or produce any supply or article necessary for the national defense or war effort. Act of June 10, 1941, 55 Stat. 248, 249. As we have held in *United States* v. *Powell, supra,* not every purchase which furthers the national defense is for "military or naval" use within the meaning of § 321 (a). But property may fall within that category though it is procured by departments other than War or Navy.

It is also suggested that the property covered by the exception in § 321 (a) is confined to property for ultimate use directly by the armed forces. Under that view materials shipped for the construction of vessels for the Maritime Commission and used to service troops at home or abroad would not be "military or naval" property. We likewise reject that argument. Civilian agencies may service the armed forces or act as adjuncts to them. The Mari-

time Commission is a good example. An army and navy on foreign shores or in foreign waters cannot live and fight without a supply fleet in their support. The agency, whether civil or military, which performs that function is serving the armed forces. The property which it employs in that service is military or naval property, serving a military or naval function.

But petitioner contends that, even if that is true, the construction of vessels or other military equipment or supplies is in a different category. It argues that none of the articles shipped in the present case was military or naval, since they were not furnished to the armed forces for their use. They were supplied, so the argument runs, for manufacture and construction which are civilian pursuits and which were here in fact performed by civilian contractors. Only the completed product, not the component elements, was, in that view, for military or naval use.

Military or naval property may move for civil use, as where Army or Navy surplus supplies are shipped for sale to the public. But in general the use to which the property is to be put is the controlling test of its military or naval character. Pencils as well as rifles may be military property. Indeed, the nature of modern war, its multifarious aspects, the requirements of the men and women who constitute the armed forces and their adjuncts, give military or naval property such a broad sweep as to include almost any type of property. More than articles actually used by military or naval personnel in combat are included. Military or naval use includes all property consumed by the armed forces or by their adjuncts, all property which they use to further their projects, all property which serves their many needs or wants in training or preparation for war, in combat, in maintaining them at home or abroad, in their occupation after victory is won. It is the relation of the shipment to the military or naval effort that is control-

ling under § 321 (a). The property in question may have to be reconditioned, repaired, processed or treated in some other way before it serves their needs. But that does not detract from its status as military or naval property. *Southern Pacific Co.* v. *Defense Supplies Corp.*, 64 F. Supp. 605. Within the meaning of § 321 (a) an intermediate manufacturing phase cannot be said to have an essential "civil" aspect, when the products or articles involved are destined to serve military or naval needs. It is the dominant purpose for which the manufacturing or processing activity is carried on that is controlling.

Measured by that test, there can be no doubt that the five types of property involved in the present litigation were "military or naval" property of the United States "moving for military or naval and not for civil use" within the meaning of § 321 (a). The lumber for the pontons, the asphalt for the airfield, the lumber for the ammunition plant were used in Army or Navy projects directly related to combat preparation or to actual combat. Copper cable for the cargo vessel, though farther removed from that category, was well within the definition of "military or naval" property. It, too, was a defensive weapon. Beyond that it was purchased by the Navy Department and consigned to one of its officers. It was supplied pursuant to Navy specifications; and the ship on which it was installed was being prepared for possible ultimate use by the Navy. The bowling alleys were also well within the statutory classification. The needs of the armed forces plainly include recreational facilities. The morale and physical condition of combat forces are as important to the successful prosecution of a war as their equipment. The fact that the bowling alleys were planned for initial use of civilian workers makes no difference. It is the nature of the work being done, not the status of the person handling the materials, that is decisive. Supplies to maintain civilians repairing Army or Navy planes is a case in point.

The dominant purpose of the project in this case was the same whether civilians or military or navy personnel did the actual work.

Petitioner contends that if Congress intended to include in "military or naval property" articles for use in the manufacture of implements of war, it would have said so. It seeks support for that position from other Congressional enactments under which such materials were excluded because not mentioned [2] or were included by specific reference.[3] We can find, however, little support for petitioner's contention in that argument. Apart from the different wording of those acts and the different ends they served, there is one decisive and controlling circumstance. We have more in § 321 (a) than a declaration that "military or naval" property is entitled to land-grant rates. Congress went further and drew the line between property moving for "military or naval" use and property moving

---

[2] The embargo against "arms or munitions of war" authorized by the Joint Resolution of March 14, 1912 (see 37 Stat. 1733), was held not to include machinery for the construction of a munitions plant. 32 Op. Atty. Gen. 132.

[3] Thus the Act of July 2, 1940, 54 Stat. 712, 714, 50 U. S. C. App. § 701, authorized the President to prohibit or curtail "the exportation of any military equipment or munitions, or component parts thereof, or machinery, tools, or material, or supplies necessary for the manufacture, servicing, or operation thereof . . . ."

The Act of November 30, 1940, 54 Stat. 1220, amending the Anti-Sabotage Act, defined "national-defense material" as including "arms, armament, ammunition, livestock, stores of clothing, food, foodstuffs, fuel, supplies, munitions, and all other articles of whatever description and any part or ingredient thereof," which the United States intended to use in the national defense.

The Act of October 16, 1941, 55 Stat. 742, authorized the President to requisition the following types of property for the defense of the United States: "military or naval equipment, supplies, or munitions, or component parts thereof, or machinery, tools, or materials necessary for the manufacture, servicing, or operation of such equipment, supplies, or munitions . . . ."

for "civil" use. As we have said, the controlling test is the use to which the property is dedicated or devoted. The fact that Congress did not define what was a "military or naval" use as distinguished from a "civil" use is unimportant. The classification made by Congress under this Act, unlike that made under the acts on which petitioner relies, was all-inclusive not partial. What is military or naval is contrasted to what is civil. The normal connotation of one serves to delimit or expand the other. It is in that context that "military or naval" must be construed.

Petitioner also contends that § 321 (a) is a remedial enactment which should be liberally construed so as to permit no exception which is not required. Cf. *Piedmont & N. Ry. Co.* v. *Interstate Commerce Commission,* 286 U. S. 299, 311–312. But it is a familiar rule that where there is any doubt as to the meaning of a statute which "operates as a grant of public property to an individual, or the relinquishment of a public interest," the doubt should be resolved in favor of the Government and against the private claimant. *Slidell* v. *Grandjean,* 111 U. S. 412, 437. See *Southern Ry. Co.* v. *United States,* 322 U. S. 72, 76. That rule has been applied in construing the reduced rate conditions of the land-grant legislation. *Southern Pacific Co.* v. *United States,* 307 U. S. 393, 401; *Southern Ry. Co.* v. *United States, supra.* That principle is applicable here where the Congress, by writing into § 321 (a) an exception, retained for the United States an economic privilege of great value. The fact that the railroads, including petitioner, filed releases of their land-grant claims in order to obtain the benefits of § 321 (a) is now relied upon as constituting full consideration for the rate concession. It is accordingly argued that the railroads made a contract with the United States which should be generously construed. Cf. *Russell* v. *Sebastian,* 233 U. S. 195, 205. The original land-grants resulted in a contract. *Burke*

v. *Southern Pacific R. Co.*, 234 U. S. 669, 680. Yet, as we have seen, they were nonetheless public grants strictly construed against the grantee. The present Act, though passed in the interests of the railroads, was in essence merely a continuation of land-grant rates in a narrower category. Therefore, it, too, must be construed like any other public grant.

*Affirmed.*