**ATLANTIC COAST LINE R. CO.**

v.

**UNITED STATES.**

No. 47213.

United States Court of Claims.

March 2, 1954.

Robert R. Faulkner, Washington, D. C., C. C. Howell and U. B. Ellis, Wilmington, N. C., on the briefs, for plaintiff.

Gilbert E. Andrews, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

WHITAKER, Judge.

The question presented in this case is whether or not defendant is entitled to land-grant freight rates on articles shipped for use by a contractor in the construction of a United States naval air station.

Plaintiff was not a land-grant railroad, but it had entered into an equalization agreement, paragraph 26(e) of which provides:

> "This carrier will not equalize net land-grant rates, except on United States Government property shipped on Government bills of lading, the transportation charges on which are paid to the carrier by and borne by the United States Government."

The shipments in question were on Government bills of lading, the transportation charges were paid by the United States Government, and it is conceded that the articles were " 'moving for military or naval and not for civil use' ". Northern Pacific Ry. Co. v. United States, 330 U.S. 248, 67 S.Ct. 747, 751, 91 L.Ed. 876.

The only question presented is whether or not at the time of the shipments the articles were the property of the United States Government.

Defendant's contract with the Duvall Engineering and Contracting Company, the George D. Auchter Company, and the Batson-Cook Company, for the erection of the United States Naval Air Station at Jacksonville, Florida, was a cost-plus-a-fixed-fee contract under which the Government agreed to reimburse the contractors for the net cost to them of the materials furnished and the services and labor performed, plus a fixed fee. It was the obligation of the contractor to supply the materials and do the work necessary to incorporate them in the buildings and the other things to be constructed. The contract, however, contained the following provision in article 10(e):

> "The Contracting Officer may, in his discretion and on behalf of the Government, take possession at any

place he may elect of any material procured by the Contractors for the purpose of transporting it to the site where it is to be used or held for further disposition and may subsequently return such material to the possession of the Contractors for use. Final disposition of any surplus material shall be made as directed by the Contracting Officer. The title to each item of materials, articles, and supplies passes to the Government when acceptance of title is authorized or approved by the Contracting Officer."

Until the contracting officer exercised the right granted him in this article of the contract, the title to the materials was in the contractors, at least until incorporated in the work to be done.

Prior to July 27, 1940, the contractors had purchased materials f. o. b. Yukon, Florida, the site of the work, and, hence, were not concerned with what happened to the materials in transit, but they were concerned about loss or damage to them after arrival at the construction site, and, hence, they approached the officer in charge of construction to inquire whether or not the Government would reimburse them for the cost of insurance which they contemplated taking out on the materials. Instead of authorizing this, the officer in charge of construction decided, in the exercise of the power conferred on him by article 10(e), to take title to the materials upon their arrival at the construction site. He, accordingly, wrote the contractors the following letter:

"Gentlemen: Unless you are specifically advised to the contrary by the Officer in Charge of Construction, the government will accept title to each item of materials, articles or supplies purchased by you for work under subject contract upon delivery of such materials, articles and supplies in accordance with the approved specification to the site of the work."

However, within a few days thereafter, the officer in charge of construction received a circular letter from the contracting officer, dated July 18, 1940, reading in part as follows:

"Practically all equipment and material will be commercial standard, and the greater part will be accepted on manufacturers' or commercial inspection laboratories' certificates. Inasmuch as a portion will probably be shipped into these locations by rail and over final carriers upon which land-grand [sic] rates are in effect, economies can be effected by making such shipments on Government bills of lading. These are to be issued by various inspection offices on route orders issued by the Bureau of Supplies and Accounts. In all cases where the Bureau of Supplies and Accounts route orders indicate that 'The Inspector * * * is authorized to accept this material and ship under Government Bill of Lading' no Navy inspection will be required, the only action being to furnish the bill of lading. At a later date, Inspectors will be instructed by the Officers-in-Charge to secure the various certificates, which will then be forwarded to the receiving officers with the original bill of lading."

This letter was written as a result of conversations between the officer in charge and officials of the Bureau of Yards and Docks relative to the advantage to be derived from land-grant rates by shipping the materials on Government bills of lading.

Following receipt of this letter, the assistant to the officer in charge, at his direction, wrote the contractors the following letter:

"1. Your attention is specifically called to letter of information dated 18 July from Budocks, copy of which was sent you,[1] and in particular, to paragraph 4 relating to

---

1. This letter is set out in the immediately preceding paragraph.

shipments on Government Bills of Lading. Please clear with this office regarding the origin and routing of material such as boiler plant equipment, gravel, cement, etc., in order that we may take advantage of these savings."

After this, wherever savings could be effected by so doing, and where time permitted, materials were shipped on Government bills of lading; or, if not shipped on Government bills of lading, they were shipped on commercial bills of lading, and Government bills of lading were substituted therefor upon arrival at destination. Such shipments were consigned to the officer in charge and were accepted by one of his representatives, who signed plaintiff's warehouse receipts.

After this procedure was instituted, most purchases of materials by the contractors were made f. o. b. the shipping point, and freight charges were paid by the defendant. Whereas the freight on all shipments on commercial bills of lading had to be paid on delivery, the shipments on Government bills of lading were not paid for on delivery, but instead, a representative of the Navy Department signed the original bill of lading and delivered it to the plaintiff; the plaintiff thereafter submitted a bill for the freight to the Navy Bureau of Supplies and Accounts, which paid it.

The Commissioner has found that the officer in charge intended his memorandum of July 27, 1940, supra, as a notification to the contractors that the Government would take title to the property purchased at the points of origin of such material, and that the contractors so understood. We think this finding is justified by the evidence, and we have adopted it as one of our findings of fact.

We think this finding is justified because the expressed purpose of shipping these materials on Government bills of lading was to take advantage of land-grant rates. This was the subject of the conversation between the officer in charge and the officials of the Bureau of Yards and Docks, and it was the stated purpose of the letter from the contracting officer of July 18, 1940, in which the contracting officer said, "economies can be effected by making such shipments on Government bills of lading." The letter from the officer in charge to the contractors directing the use of Government bills of lading stated that the purpose thereof was "in order that we may take advantage of these savings."

It must be assumed that both plaintiff and the officer in charge were cognizant of the provision of the equalization agreement relative to land-grant rates, paragraph 26(e) of which provided that:

"This carrier will not equalize net land-grant rates, *except on United States Government property* shipped on Government bills of lading, the transportation charges on which are paid to the carrier by and borne by the United States Government." [Italics ours.]

If, therefore, the property purchased had not become Government property prior to the shipment, the carrier was not obligated to transport them at land-grant rates. Land-grant rates applied only "on United States Government property." Hence, since the avowed purpose of shipping these articles on Government bills of lading was to secure the benefit of land-grant freight rates, we are obliged to assume that the Government intended to take title to the property prior to the shipment, because, otherwise, it would not be entitled to these rates.

The contractors necessarily understood that it was the Government's intention to take title to this property prior to shipment because they were advised that shipment on bills of lading was for the purpose of getting the benefit of the land-grant rates, and this benefit could not have been obtained without doing so.

"Plaintiff, however, says that article 10(e) of the contract for the construction at the United States Naval Air Station gave the contracting officer the authority to take possession of materials without taking title thereto, and it says that this is all the Government did. However, this article, in addition to giving the contracting officer authority to take possession of the materials, further provides, "The title to each item of materials, articles, and supplies passes to the Government when acceptance of title is authorized or approved by the Contracting Officer."

Since the purpose of the Government was to get the benefit of the land-grant rates, and since this could not have been accomplished except by the Government's taking of title to the articles before shipment, it must be assumed that it was the Government's intention, not only to take possession of the articles, but also to take title thereto prior to shipment. The consigning of the shipments to the officer in charge, and the payment of the freight charges by the Government is a clear indication that the Government considered the articles as its property.

We must conclude that the Government by its letter of July 27, 1940, intended to take title to the articles purchased.

The case of Kern-Limerick, Inc., v. Scurlock, 74 S.Ct. 403, lends some support to the above. That case involved the Government's right to exemption from a State sales tax where the materials to be used in the construction of an ammunition dump had been purchased by the contractors under a provision of the contract which made them the agents of the Government in so doing. The Court held that under the facts of that case, the Government was the purchaser, and, hence, the sale was not subject to the tax.

Plaintiff is not entitled to recover and, therefore, its petition is dismissed.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.