OPINION
Whitaker, Judge,
delivered the opinion of the court:
The question presented in this case is whether or not defendant is entitled to land-grant freight rates on articles shipped for use by a contractor in the construction of a United States naval air station.
*726 Plaintiff was not a land-grant railroad, but it bad entered into an equalization agreement, paragraph 26 (e) of which provides:
This carrier will not equalize net land-grant rates, except on United States Government property shipped on Government bills of lading, the transportation charges on which are paid to the carrier by and borne by the United States Government.
The shipments in question were on Government bills of lading, the transportation charges were paid by the United States Government, and it is conceded that the articles were “moving for military or naval and not for civil use.” Northern Pacific Ry. Co. v. United States, 330 U. S. 248.
The only question-presented is whether or not at the time of the shipments the articles were the property of the United States Government.
Defendant’s contract with the Duvall Engineering and Contracting Company, the George D. Auchter Company, and the Batson-Cook Company, for the erection of the United States Naval Air Station at Jacksonville, Florida, was a cost-plus-a-fixed-fee contract under which the Government agreed to reimburse the contractors for the net cost to them of the materials furnished and the services and labor performed, plus a fixed fee. It was the obligation of the contractor to supply the materials and do the work necessary to incorporate them in the buildings and the other things to be constructed. The contract, however, contained the following provision in article 10 (e) :
The Contracting Officer may, in his discretion and on behalf of the Government, take possession at any place he may elect of any material procured by the Contractors for the purpose of transporting it to the site where it is to be used or held for further disposition and may subsequently return such material to the possession of the Contractors for use. Final disposition of any surplus material shall be made as directed by the Contracting Officer. The title to each item of materials, articles, and supplies passes to the Government when acceptance of title is authorized or approved by the Contracting Officer.
*727 Until the contracting officer exercised the right granted him in this article of the contract, the title to the materials was in the contractors, at least until incorporated in the work to be done.
Prior to July 27, 1940, the contractors had purchased materials f. o. b. Yukon, Florida, the site of the work, and, hence, were not concerned with what happened to the materials in transit, but they were concerned about loss or damage to them after arrival at the construction site, and, hence, they approached the officer in charge of construction to inquire whether or not the Government would reimburse them for the cost of insurance which they contemplated taking out on the materials. Instead of authorizing this, the officer in charge of construction decided, in the exercise of the power conferred on him by article 10 (e), to take title to the materials upon their arrival at the construction site. He, accordingly, wrote the contractors the following letter:
Gentlemen: Unless you are specifically advised to the contrary by the Officer in Charge of Construction, the government will accept title to each item of materials, articles or supplies purchased by you for work under subject contract upon delivery of such materials, articles and supplies in accordance with the approved specification to the site of the work.
However, within a few days thereafter, the officer in charge of construction received a circular letter from the contracting officer, dated July 18, 1940, reading in part as follows:
Practically all equipment and material will be commercial standard, and the greater part will be accepted on manufacturers’ or commercial inspection laboratories’ certificates. Inasmuch as a portion will probably be shipped into these locations by rail and over final carriers upon which land-grand [sic] rates are in effect, economies can be effected by making such shipments on Government bills of lading. These are to be issued by various inspection offices on route orders issued by the Bureau of Supplies and Accounts. In all cases where the Bureau of Supplies and Accounts route orders indicate that “The Inspector * * * is authorized to accept this material and ship under Government Bill of Lading” no Navy inspection will be required, the only *728 action being to furnish, the bill of lading. At a later date, Inspectors will be instructed by the Officers-in-Charge to secure the various certificates, which will then be forwarded to the receiving officers with the original bill of lading.
This letter was written as a result of conversations between the officer in charge and officials of the Bureau of Yards and Docks relative to the advantage to be derived from land-grant rates by shipping the materials on Government bills of lading.
Following receipt of this letter, the assistant to the officer in charge, at his direction, wrote the contractors the following letter:
1. Your attention is specifically called to letter of information dated 18 July from Budocks, copy of which was sent you,[1] and in particular, to paragraph 4 relating to shipments on Government Bills of Lading. Please clear with this office regarding the origin and routing of material such as boiler plant equipment, gravel, cement, etc., in order that we may take advantage of these savings.
After this, wherever savings could be effected by so doing, and where time permitted, materials were shipped on Government bills of lading; or, if not shipped on Government bills of lading, they were shipped on commercial bills of lading, and Government bills of lading were substituted therefor upon arrival at destination. Such shipments were consigned to the officer in charge and were accepted by one of his representatives, who signed plaintiff’s warehouse receipts.
After this procedure was instituted, most purchases of materials by the contractors were made f. o. b. the shipping point, and freight charges were paid by the defendant. Whereas the freight on all shipments on commercial bills of lading had to be paid on delivery, the shipments on Government bills of lading were not paid for on delivery, but instead, a representative of the Navy Department signed the original bill of lading and delivered it to the plaintiff; the *729 plaintiff thereafter submitted a bill for the freight to the Navy Bureau of Supplies and Accounts, which paid it.
The Commissioner has found that the officer in charge intended his memorandum of July 27,1940, supra, as a notification to the contractors that the Government would take title to the property purchased at the points of origin of such material, and that the contractors so understood. We think this finding is justified by the evidence, and we have adopted it as one of our findings of fact.
We think this finding is justified because the expressed purpose of shipping these materials on Government bills of lading was to take advantage of land-grant rates. This was the subject of the conversation between the officer in charge and the officials of the Bureau of Yards and Docks, and it was the stated purpose of the letter from the contracting officer of July 18, 1940, in which the contracting officer said, “economies can be effected by making such shipments on Government bills of lading.” The letter from the officer in charge to the contractors directing the use of Government bills of lading stated that the purpose thereof was “in order that we may take advantage of these savings.”
It must be assumed that both plaintiff and the officer in charge were cognizant of the provision of the equalization agreement relative to land-grant rates, paragraph 26 (e) of which provided that:
This carrier will not equalize net land-grant rates, except on United, States Government property shipped on Government bills of lading, the transportation charges on which are paid to the carrier by and borne by the United States Government. [Italics ours.]
If, therefore, the property purchased had not become Government property prior to the shipment, the carrier was not obligated to transport them at land-grant rates. Land-grant rates applied only “on United States Government property.” Hence, since the avowed purpose of shipping these articles on Government bills of lading was to secure the benefit of land-grant freight rates, we are obliged to assume that the Government intended to take title to the property prior to the shipment, because, otherwise, it would not be entitled to these rates.
*730 The contractors necessarily understood that it was the Government’s intention to take title to this property prior to shipment because they were advised that shipment on bills of lading was for the purpose of getting the benefit of the land-grant rates, and this benefit could not have been obtained without doing so.
Plaintiff, however, says that article 10 (e) of the contract for the construction at the United States Naval Air Station gave the contracting officer the authority to take possession of materials without taking title thereto, and it says that this is all the Government did. However, this article, in addition to giving the contracting officer authority to take possession of the materials, further provides, “The title to each item of materials, articles, and supplies passes to the Government when acceptance of title is authorized or approved by the Contracting Officer.”
Since the purpose of the Government was to get the benefit of the land-grant rates, and since this could not have been accomplished except by the Government’s taking of title to the articles before shipment, it must be assumed that it was the Government’s intention, not only to take possession of the articles, but also to take title thereto prior to shipment. The consigning of the shipments to the officer in charge, and the payment of the freight charges by the Government is a clear indication that the Government considered the articles as its property.
We must conclude that the Government by its letter of July 27,1940, intended to take title to the articles purchased.
The case of Kern-Limerick, Inc. v. Scurlock, 347 U. S. 110, lends some support to the above. That case involved the Government’s right to exemption from a State sales tax where the materials to be used in the construction of an ammunition dump had been purchased by the contractors under a provision of the contract which made them the agents of the Government in so doing. The Court held that under the facts of that case, the Government was the purchaser, and, hence, the sale was not subject to the tax.
Plaintiff is not entitled to recover and, therefore, its petition is dismissed.
Madden, Judge; Littleton, Judge; and Jones, Ohief Judge, concur.
*731 FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a 'corporation created, organized, and existing under the laws of the State of Virginia, is a common carrier by railroad of persons and property for hire in the southeastern section of the United States, and as such is engaged in interstate commerce and subject to the Interstate Commerce Act, its tariff charges for transportation services rendered being duly published and filed as required by law. Plaintiff’s lines of railroad connect with the lines of other common carriers by railroad who are likewise engaged in interstate commerce and subject to the Interstate Commerce Act and whose tariff charges for transportation services rendered are duly published as required by law.
2. Although plaintiff was not a land-grant carrier, it was subject to the equalization agreements, and prior to the transactions involved here plaintiff was a party to the land-grant equalization agreement entered into between the Government and various carriers. Paragraph 26 (e) of the equalization agreement provided as follows :
This carrier will not equalize net land-grant rates, except on United States Government property shipped on Government bills of lading, the transportation charges on which are paid to the carrier by and borne by the United States Government.
3. Beginning in 1940 and continuing through a portion of 1943, large quantities of construction materials were transported over the lines of several railroads, including plaintiff as delivering carrier, and were delivered by plaintiff at the site of the United States Naval Air Station, Jacksonville, Florida, which was in the process of construction during that period. Plaintiff brought this action to recover the sum of $348,178.29, representing the difference between the commercial freight rates, claimed by plaintiff, and the land-grant rates paid by the defendant for the transportation of 7,072 carloads of materials consisting of gravel, rock, cement, slag, *732 lumber, etc., during the period September 16, 1940, to September 1,1943.
4. Approximately one-third of the shipments that were delivered by plaintiff to the United States Naval Air Station at Jacksonville were made on commercial bills of lading, and no claim is made with respect to such shipments. The remaining two-thirds of the shipments, which are involved in this suit, were made on Government bills of lading or on commercial bills of lading, which were later exchanged for Government bills of lading.
The parties have agreed that all of the materials and commodities which were shipped over plaintiff’s line and delivered by it for the construction of the air station moved for naval and not for civilian use, and the basic issue is whether the materials shipped by Government bills of lading were the property of the United States at the time of shipment. Plaintiff contends that title to the materials shipped on the Government bills of lading did not vest in the United States until the materials were delivered at the job site and that, since the materials were not the property of the United States at the time of shipment, the land-grant rates were not applicable to them. By order of the Court, the trial was limited to the issue as to whether or not the United States is liable for any portion of the money sought to be recovered.
5. The naval air station, which extends over approximately 500 acres of land and is situated at Yukon, Duroc, and Green Cove Springs, Florida, all near the City of Jacksonville, was constructed pursuant to a written cost-plus-a-fixed-fee contract entered into under date of June 28,1940, between the defendant, represented by the Chief of the Bureau of Yards and Docks of the Navy Department, as contracting officer, and three corporations, namely, Duval Engineering and Contracting Company, The George D. Auchter Company, and the Batson-Cook Company, hereinafter referred to as the contractors. The contractors undertook the construction of the naval air station, including 62 different projects, at an estimated cost of $12,336,000, in addition to a fixed fee of $525,000. During the progress of construction, *733 additional projects were added so that the final contract price aggregated aproximately $64,000,000. Work on the contract started early in July 1940, and was completed in the Fall of 1943.
6. Under the terms of the contract, which was designated Contract NOy 4132, the contractors were obligated to provide all of the plant, equipment, services, labor, and materials required for the completion of the work, and the Government agreed to pay the contractors the net cost of the materials, labor, and services furnished, plus the stipulated fixed fee.
Article 1 of the contract provided that the Government would designate an Officer in Charge who, under the direction of the contracting officer, was to have complete charge, on behalf of the Government, of the work under the contract in the field. Article 2 of the contract provided that the contractors should designate an Operating Committee, consisting of three persons, to have complete charge of all work in the field under the contract in behalf of the contractors.
The contract also provided in pertinent part as follows:
MATERIALS
Article 10. — (a) All materials required for the accomplishment of the work under this contract shall be provided by the Contractors, including materials, articles, and supplies required for temporary use and such as may be consumed in use.
(b) No purchase contract or order in excess of $500 shall be made or placed without the prior approval of the Contracting Officer or his authorized representative.
(c) No subcontract for materials and services or labor combined shall be entered into by the Contractors without the specific approval in writing of the Contracting Officer.
*}• «I? »í» sfc
(e) The Contracting Officer, may, in his discretion and on behalf of the Government, take possession at any place he may elect of any material procured by the Contractors for the purpose of transporting it to the site where it is to be used or held for further disposition and may subsequently return such material to the possession of the Contractors for use. Final disposition of any surplus material shall be made as directed by *734 tbe Contracting Officer. The title to each item of materials, articles, and supplies passes to the Government when acceptance of title is authorized or approved by the Contracting Officer.
* * * * %
INSPECTIONS
Article 12. — (a) All material and workmanship, except as may be otherwise provided herein or otherwise authorized by the Contracting Officer, shall be subject to inspection, examination, and test by Government inspectors, or inspectors employed by the Contractors with the approval of the Contracting Officer, at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material, and the contractors shall promptly segregate and remove the same from the premises.
% ijs ijs í¡{
(d) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in specifications; and such inspection and acceptance, unless otherwise stated in specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract and specifications and drawings made a part thereof, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site.
He % sj: H: H«
FINAL OR CONDITIONAL ACCEPTANCE OF WORK
Article 21. — The Government reserves the right to take over and accept completed individual projects or work unconditionally at such time as its interests require as determined by the Contracting Officer and to take over any uncompleted individual project or work condition *735 ally for Government use under such, working arrangement as may be agreed upon by the parties to the contract.
*****
COMPENSATION
Article 26. — The Government hereby covenants, promises, and agrees to and with the Contractors, in consideration of the covenants and agreements on the part of the contractors, herein contained, being strictly performed and kept by the Contractors, as specified herein, to pay or cause to be paid to the Contractors the sum of the actual net cost to the Contractors of the materials actually furnished and the services and labor actually performed under the terms of this contract, plus-a-fixed-fee amounting to $525,000.00.
*****
It being the general intent and understanding by and between the parties to this contract that the Contractors shall be reimbursed for all out-of-pocket expenditures made by them for or on account of the contract which are specifically or impliedly authorized, sanctioned, or approved by the Contracting Officer or by his direction, it is further agreed that the term “actual net cost” shall include specifically, but not necessarily exclusively, the following:
Ht $ ‡
(b) The amount of any loss or damage suffered by the Contractors under the provisions of Article 8 hereof, and not covered by insurance, as the Congress may authorize to be paid.
% % ‡ # jji
(d) The actual net cost to the Contractors of all materials furnished by them under the provisions of Article 10 hereof, including purchasing, inspecting, storing, transporting, insuring, salvaging, and other usual expenses incident to the procurement and use of materials as may be authorized by the Contracting Officer.
payments to the contractors
Article 27. — The Government agrees that the Contractors may submit at intervals of not less than seven calendar days payment requisitions accompanied by duly certified and approved payrolls, invoices, bills, or other *736 substantiating documents, including the Contractors’ bill on account of the prescribed fixed fee, all equaling the amount of the requisition. Payment requisitions shall he submitted to the Officer in Charge. The Government further agrees that as soon as practicable after the receipt of each payment requisition there will be prepared a Public Voucher which shall be signed by a duly authorized representative of the Contractors and thereafter by the Contracting Officer or his authorized representative and thereupon transmitted to such Naval Disbursing Officer as may be designated by the Contracting Officer for the issuance and delivery of a Government check drawn payable to the order of the Contractors. The Contracting Officer shall have the right to defer approval of payments at any time in an amount not to exceed ten percentum of all payments previously made on account of the Contractors’ fee, if in his judgment such action is necessary to properly protect the interests of the Government.
. Partial payments on account of the fixed fee shall be based upon and be in proportion to payments to the Contractors on account of work under the contract.
7. Commander C. H. Cotter was the Officer in Charge from the date the contract was entered into until December 1,1940, when he was succeeded by Commander R. H. Meade. Commander Meade served as Officer in Charge until April 9,1942, on which date he was relieved by Lieutenant E. H. Thourn. Included in the authority which was delegated by the contracting officer to the Officer in Charge was the following:
The Officer' in Charge, or such Resident Officer in Charge as he may designate, will act for the Contracting Officer in approving purchases in excess of $500; in the matter of taking possession of material for transportation by the Government; in the matter of disposition of surplus material; and in the matter of taking title to materials, articles, and supplies. The Contracting Officer will act personally in the matter of authorizing any subcontract.
8. Pursuant to Article 2 of the contract, the contractors created an Operating Committee, which was comprised of one officer from each of the contracting companies. The Operating Committee employed a certified public accountant, who established the required accounting procedures and acted as chief accountant for the contractors throughout *737 the period of performance. The Operating Committee also designated an employee of one of the contractors as purchasing agent. He was directly responsible to the Operating Committee and was in charge of purchasing, the materials and supplies that were acquired for the construction of the project. On his staff, there was an assistant purchasing agent who was on the contractors’ payroll but was subject to the jurisdiction of the Officer in Charge.
9. As required by Article 10 of the contract, the contractors provided all the materials needed for the completion of the contract, with the exception of certain dry docks supplied by the Navy and some material furnished by subcontractors. Each purchase involving more than $500 was subject to the prior approval of the Officer in Charge, but neither he nor his staff made any effort to tell the contractors where to buy the material. The contractors invited quotations from vendors for materials on the basis of prices f. o. b. point of origin or f. o. b. point of destination and placed orders with the lowest bidders. When a vendor’s quotation was accepted, the purchasing agent issued a purchase order which was on a printed form prepared by the Operating Committee and approved by the Officer in Charge. A typical purchase order which, with minor modifications, was in use until the latter part of December 1942 had the following pertinent information printed on the face thereof:
THE DUVAL ENGINEERING & CONTRACTING CO. AND THE GEORGE D. AUCHIER CO. AND BATSON-COOK CO., OPERATING AS CONTRACTORS POR CONTRACT NOT-4132, JACKSONVILLE, FLORIDA
Purchase Order
To: Beq. No.-
Gentlemen: Please ship the following Articles to:
[followed either by the words “Us, at Yukon, Florida,” or “Contractors, contract NOy 4132, Yukon, Florida.”]
[Subject to all conditions stated hereon and on reverse side]

Important

Invoice in triplicate must be made out to The Duval Engineering & Contracting Company and The George *738 D. Auchter Company and Batson-Cook Company Operating as Contractors for Contract NOY-4132, U. S. Naval Air Station and mailed to P. O. Box 1859, Jacksonville, Fla., on the day shipment is made.
Quantity No. Unit Measure Description Price Unit Amount

1

Note. — “The materials covered by this order are for the exclusive use of the United States and title to same vests in the United States when acceptance of title is authorized or approved by the Contracting Officer mentioned in Contract NOY-4132, for Naval Air Station, Jacksonville, Florida, and vicinity, or upon their delivery and acceptance, in accordance with the terms of this order, to Duval Engineering & Contracting Company and the George D. Auchter Company and Batson-Cook Company, Contractors in said mentioned contract.” State and local taxes are not applicable to this purchase for the sole account of the United States.
For project_ _ Purchasing agent
To be Retained by Vendor
On the reverse side of the purchase order were a number of printed instructions, including Instructions 1 and 15, which read as follows:
conditions
1. Delivery to be made F. O. B. cars or F. O. B. other means of transportation at location shown on the face of this order. Transportation charges must be prepaid.
* * * % it:
15. Invoices in triplicate must be mailed to The Duval Engineering & Contracting Company and The George D. Auchter Company and Batson-Cook Company, as Contractors for Contract NOY-4132, U. S. Naval Air Station, P. O. Box 1859, Jacksonville, Florida, on the day shipment is made.
Each invoice must be accompanied by the following papers:
(a) Original or copy of bill of lading when shipment is made by freight or express.
*739 10. The contractors began to purchase material for the project on July 12, 1940. Shipments of material between that date and September 16,1940, were made by rail on commercial bills of lading or were delivered in trucks. For the most part, during the early days of the contract, all materials and supplies were purchased f. o. b. Yukon, Florida, the destination point. This practice was followed by the Operating Committee in order to relieve the contractors from responsibility for the material until it was delivered at the site and to avoid the necessity of handling the details involved in filing claims for damage and shortages. Where material was purchased f. o. b. destination and the freight was not prepaid by the vendor, the contractors deducted the freight at commercial rates from the amount of the vendor’s invoice. Delivery was accepted for the contractors by a warehouse clerk, who executed plaintiff’s warehouse receipts.
11. The vendors from whom the materials were purchased submitted all invoices covering the purchases directly to the contractors in accordance with the terms of the purchase orders. As the material was delivered to the site by the plaintiff as delivering carrier, it was inspected by a representative of the contractors and by a Navy inspector, both of whom signed an inspection and receiving report which was transmitted to the contractors’ accounting department. If the invoice checked with the receiving and inspection report, the contractors issued a check to the vendor in payment of the material. As provided by Article 27 of the contract, the contractors submitted payment requisitions weekly to the Officer in Charge, and the requisitions were accompanied by payrolls, invoices submitted by vendors of material, receiving and inspection reports and other substantiating documents. Upon approval of the requisitions, a public voucher and check were thereafter issued by the Navy to reimburse the contractors for such authorized expenditures. In this manner, the contractors were reimbursed for all sums paid out by them throughout the period of the contract for the purchase of materials, including any freight paid for the transportation of materials.
12. A short time prior to July 15,1940, the contractors became concerned about their responsibility for loss of or *740 damage to the vast quantities of construction materials which would be accumulated at the job site. They inquired of the Officer in Charge whether the insurance of these materials against destruction by lire or other hazards would constitute a reimbursable cost under the contract. Thereupon, the Officer in Charge informed the contractors that no insurance would be necessary since the Government would, by virtue of the provisions of Article 10 (e) of the contract, accept title to all material upon its delivery to the job site. His statement was confirmed in a written memorandum which he issued under date of July 15, 1940, and which read as follows:
UNITED STATES NAVAL AIR STATION JACKSONVILLE, FLORIDA

15 Juh/ 191ft.

Subject: Acceptance of title by government to materials and supplies, Contract NOy 4132, Naval Aviation Facilities, Naval Air Station, Jacksonville, Florida.
Gentlemen: Unless you are specifically advised to the contrary by the Officer in Charge of Construction, the government will accept title to each item of materials, articles or supplies purchased by you for work under subject contract upon delivery of such materials, articles and supplies in accordance with the approved specification to the site of the work.
Very truly yours,
C. H. Cotter,

Gomdr. {OEG) USN, Officer in Charge of Vonstruction.

Contractors, Contract NOy 4132,
George I). Auchter Company,
Foot Adams Street,
Jacksonville, Florida.
13. At or prior to the time the contract was entered into, nothing was said to the contractors regarding the shipment of materials to the project on Government bills of lading. However, on July 24, 1940, the Officer in Charge received from the contracting officer a circular letter dated July 18, 1940, which related to the shipment of materials to be used in cost-plus-a-fixed-fee contracts, stating in pertinent part:
Practically all equipment and material will be commercial standard, and the greater part will be accepted *741 on manufacturers’ or commercial inspection laboratories’ certificates. Inasmuch as a portion will probably be shipped into these locations by rail and over final carriers upon which land-grand [sic] rates are in effect, economies can be effected by making such shipments on Government bills of lading. These are to be issued by various inspection offices on route orders issued by the Bureau of Supplies and Accounts. In all cases where the Bureau of Supplies and Accounts route orders indicate that “The Inspector * * * is authorized to accept this material and ship under Government Bill of Lading” no Navy inspection will be required, the only action being to furnish the bill of lading. At a later date, Inspectors will be instructed by the Officers-in-Charge to secure the various certificates, which will then be forwarded to the receiving officers with the original bill of lading.
The letter had been preceded by discussions between officials in the Bureau of Yards and Docks and the Officer in Charge concerning the advisability of shipping construction materials destined for Contract NOy 4132 on Government bills of lading in order to take advantage of the land-grant freight rates and thereby effect a substantial saving to the Government. The letter was circularized among the contractors.
14. Promptly after the receipt of the circular letter, the Officer in Charge directed the establishment of a procedure for the issuance of Government bills of lading covering the shipment of materials from the places where such materials were purchased by the contractors to the project in all cases where it was found practical and economical to ship via' Government bills of lading. At the direction of the Officer in Charge, his assistant sent the contractors the following memorandum under date of July 27,1940:

27 July 191fi.

From: Officer in Charge of Construction, Contractors, Contract NOy 4132, Attention: Mr. Murphey.
Subject: Shipments on Government Bills of Lading.
1. Your attention is specifically called to letter of information dated 18 July from Budocks, copy of which was sent you, and in particular, to paragraph 4 relating to shipments on Government Bills of Lading. Please clear with this office regarding the origin and routing *742 of material such as boiler plant equipment, gravel, cement, etc., in order that we may take advantage of these savings.
Authur F. Perry, Jr.
By direction.
The above-quoted memorandum was intended by the Officer in Charge as a modification of his earlier memorandum of July 15, 1940 (finding 12) and the contractors so understood. The memorandum of July 15, 1940, was never expressly rescinded.
15. After the memorandum of July 27, 1940, was issued, the contractors requested prospective vendors to submit quotations on the basis of prices f. o. b. point of origin and f. o. b. point of destination. When the bids were received, an abstract was made up and a teletype message was then sent in the name of the Officer in Charge to the Navy Bureau of Supplies and Accounts, Washington, D. C., requesting a statement of the land-grant freight rates applicable to the transportation of material to be supplied from the plant of the vendor. After securing information on the land-grant freight rates, the assistant purchasing agent obtained the applicable commercial freight rates and a comparison was made to arrive at the lowest cost of the material and its transportation. If it appeared that an appreciable saving to the Government could be realized by shipping the commodity from the plant of the successful bidder over a route to which the land-grant freight rates applied, a teletype message was then sent by the Officer in Charge to the Bureau of Supplies and Accounts, Washington, D. C., requesting the Bureau to supply a routing order for the shipment and to authorize the Inspector of Naval Materials residing in the district of the vendor to issue a Government bill of lading covering the shipment. The Bureau then issued a routing order for the shipment and sent the Inspector of Naval Materials a Government bill of lading. After he had inspected the purchased material, the Inspector issued a Government bill of lading covering the shipment, naming the Officer in Charge as consignee and certifying the bill as the issuing officer.
16. Following the issuance of a Government bill of lading, the shipment moved to the site over the lines of various *743 railroads, including plaintiff as the final and delivering carrier. On such shipments which were consigned to the Officer in Charge, one of his representatives accepted delivery and signed plaintiff’s warehouse receipts. In lieu of paying the freight charges at that time, a representative of the Navy Department signed the original bill of lading and delivered it to the plaintiff, and thereafter a hill for the charges was transmitted by plaintiff to the Navy Bureau of Supplies and Accounts, which paid plaintiff the transportation charges upon presentation of the Government bill of lading.
In some cases, payment of the transportation charges, based on the land-grant rates, was accepted by plaintiff, which thereafter submitted supplemental bills for the difference between the commercial and the land-grant rates. Payment of the supplemental bills was denied by the General Accounting Office. In other cases, payment was originally made to plaintiff at the full commercial rates, although the shipments were made on Government bills of lading. Later, upon audit of the bills, the General Accounting Office determined that the bills had been overpaid by the difference between the land-grant rate and the commercial rate. The amount of the overpayments thus determined was deducted from other bills submitted by plaintiff or was paid by plaintiff under protest.
17. Each shipment which moved on a Government bill of lading was inspected at the site in the same manner as has been described in finding 11 and a receiving and inspection report sent in each instance to the accounting office of the contractors. In the event any loss or damage occurred to the shipment during transit, a notation to that effect was made on the Government bill of lading and a claim for such loss was made directly by the Bureau of Supplies and Accounts, Washington, D. C., on plaintiff.
18. The procedure described above was instituted during the month of August 1940 and was followed by each successor officer in charge until the contract was completed. The first Government bill of lading on which a shipment was made to the project was dated September 16, 1940.
*744 By the memorandum of July 27,1940, the Officer in Charge intended to notify the contractors that the Government would take title to property purchased from vendors at the points of origin of such material, because it was the understanding of the Officer in Charge and of his staff that Government bills of lading could be used only with respect to property to which the Government had title. The contractors also understood that when a Government bill of lading was issued on a particular shipment at the point of origin, the Government took title to the property at that point and that they were absolved from any damage or loss which occurred to the shipment during transit.
19. There were a few instances where it appeared that substantial savings could be made by shipment over land-grant routes but there was not sufficient time for the transmission of a Government bill of lading from the Bureau of Supplies and Accounts to the Inspectors of Naval Material resident in the district of the vendor. In such cases, the Bureau of Supplies and Accounts notified the Officer in Charge by teletype of the number of the Government bill of lading assigned to the shipment and mailed the bill of lading to him. In the meantime, the vendor was instructed by telegram to use a commercial bill of lading for the shipment but to place a notation thereon stating that it was to be exchanged at destination for a Government bill of lading. Upon arrival of the shipment at the site, plaintiff’s agent presented the commercial bill of lading, upon which no freight had been paid, to the Officer in Charge, who then signed the Government bill of lading as issuing officer and exchanged bills with plaintiff’s agent. Thereafter, plaintiff presented the Government bill of lading to the Bureau of Supplies and Accounts, Washington, D. C., and obtained payment of the freight charges in the manner described above. The number of such shipments in which a commercial bill of lading was later exchanged for a Government bill of lading represents a small percentage of the total number involved in this claim.
20. After the practice of issuing Government bills of lading began, the purchasing agent of the contractors continued until about January 1, 1943, to issue purchase orders to *745 vendors on a form containing the same printed matter as that described in finding 9. However, the typewritten body of the purchase order which was used when Government bills of lading were issued contained the following:
Shipment to be made on Government Bill of Lading furnished you by Inspector of Naval Material in your District.
21. After the procedure involving the use of Government bills of lading was instituted, most of the purchase orders provided that prices to be paid the vendors were on the basis of f. o. b. the plants of the vendors. When the memorandum of July 27, 1940, was issued, there were outstanding a number of purchase orders on which shipments had not been made and which provided for sale prices f. o. b. destination. These orders were amended to provide for payment to the vendors on the basis of prices f. o. b. point of origin.
There were, however, some shipments on Government bills of lading in which the purchase orders provided that the vendors’ prices were f. o. b. destination. In such cases, the contractors deducted the freight at full commercial rates from the amount of the vendors’ invoices. The evidence does not establish the extent to which this practice was followed on the shipments which are in dispute here.
22. Approximately 75,000 purchase orders were issued during the period of construction. On November 26, 1942, the Assistant Chief of the Bureau of Yards and Docks issued a circular letter which directed the Officer in Charge to have the purchase order forms reprinted to comply with the instructions contained in the letter. The form attached to the letter indicated that the new purchase order was to have the following printed on the face thereof:
Bureau of Yards & Docks
NAVY DEPARTMENT
By (Name of Contractor), Purchasing Agent Contract NOy-
A space was also provided at the bottom for the signature of the Officer in Charge below the words: “Approved for U. S. Government.” There was also a space at the bottom for the signature of the contractor as purchasing agent. *746 The conditions which were ordered to be printed on the reverse side of the new purchase order included, insofar as pertinent, the following:
1. The vendor agrees to make shipment on Government Bills of Lading, or by either prepaid or collect Commercial Bills of Lading, as elected by the vendee and stated on the face of this order.
2. This purchase is made by the Government, and the Government shall be obligated to the vendors for the purchase price, hut the Contractor shall handle all payments therefor on behalf of the Government. The vendor agrees to make demand or claim for payment of the purchase price from the Government through the medium of the Contractor. All purchases hereunder are made for the account of the Government, and all title, delivery and transportation papers shall be made out in the name of the Government, in care of the Contractor.
3. Title to all materials and supplies purchased hereunder shall vest in the United States Government upon their delivery to and acceptance by a representative of the Government or the Contractor.
4. The amount of any Federal Tax imposed upon the Contractor with respect to the articles covered by this Purchase Order is not included in the prices stated herein unless so stated on the face of this order.
5. The amount of any taxes imposed by States, or political subdivisions thereof, on the sale of articles covered by this Purchase Order is not included in the prices stated herein unless so stated on the face of this order.
ifc jJ: * *
9. Materials received which do not conform with the specifications of this Purchase Order are subject to return to the Vendor at the Vendor’s risk and expense.
^ # # # ifc
12. Invoices must be prepared (in duplicate) in the name of, and he forwarded to, the Contractor whose name appears on the face of this Purchase Order. State discount terms on invoices. Each shipment must be covered by a separate invoice (in duplicate).
The record does not disclose whether new purchase orders were issued in accordance with the circular letter after the receipt thereof but, if so, the time required for printing the new forms would have postponed their use until about Jan *747 uary 1, 1948. Most of the shipments involved in this suit were made prior to that date.
23. In all cases where shipments were made on Government bills of lading, the vendors billed the contractors for the purchase price in the same manner as when shipments were made on commercial bills of lading. Except as otherwise stated in preceding findings, the procedure described in finding 11 with respect to the manner in which the material under the contract was purchased, inspected, and paid for, and the method by which the contractors were reimbursed for the cost of material shipped to the project remained in effect when Government bills of lading were used.
24. After the memorandum of July 27,1940, was issued at the direction of the Officer in Charge, a number of shipments were made on commercial bills of lading in which the contractors were named as consignee. These included all shipments in less than carload lots, local shipments, and shipments on which appreciable savings could not be achieved by use of the land-grant rates. The procedure incident to the use of Government bills of lading was more cumbersome and time-consuming than was required when commercial bills of lading were used. For that reason, shipments of material needed at the project immediately were also usually made on commercial bills of lading. The maimer in which transportation charges on such shipments, including the reimbursement of the contractors for freight bills paid by them, has been described in finding 11.
25. In accordance with the provisions contained in Article 10 (c) of the contract, the contractors entered into numerous subcontracts. The total amount of the subcontracts represented approximately 20 percent of the total cost of the prime contract. The cost of the materials purchased and used by the subcontractors was about 10 percent of the cost of all materials used in the construction of the project. The subcontracts were prepared on forms supplied by the contractors. Each subcontract contained a provision stating that the contractor and subcontractor agreed to be bound by the terms of the prime contract between the contractor and the Government. Under some of the subcontracts, the *748 subcontractors were required to furnish only labor; under others, they supplied both labor and materials. Subcontracts under which substantial quantities of material were furnished by the subcontractors included the electrical work, the plumbing work, the erection of structural steel, and the construction of steel hangars and hangar doors.
26. Typical of the subcontracts which were executed during the Summer of 1940 was one entered into on August 22, 1940, between the contractors and Truscon Steel Company, which agreed to furnish all labor and material needed for the installation and completion of hangars and hangar doors for a total consideration of $133,711. The agreement provided in pertinent part as follows:
It is understood that all freight has been deducted from the contract price. All materials shall be routed by the Government, shipped on a Government Bill-of-Lading and consigned to Contractors NOY-4132, Yukon, Florida or Green Cove Springs, Fla. Monthly estimates to be paid to the subcontractor for 90% of the value of the materials erected and those materials on the site which have been approved by the Navy Department and ownership thereof vested in the Navy Department each month and final payment including the retained percentage of previous payments to be paid to the subcontractor within 30 days after completion and approval of all work covered by this agreement.
27. Under date of October 21,1942, the contractors entered into a subcontract with the A. C. Ferguson Company, which agreed to furnish all of the labor, materials, and equipment necessary for the completion of certain roofing and sheet metal work for a consideration of $7,207.50. The contract, which was also typical of the subcontracts entered into during the period of construction, contained the following provision :
*****
Subcontractor shall furnish information as to shipping weights, points of origin, etc., for use in determining land grant freight rate savings and the Contractor reserves the right to deduct regular commercial freight rates from the contract amount, route materials and receive shipments on government bills of lading in order *749 to use the land grant freight rate. The savings realized shall revert to the government.
28. With respect to a number of subcontracts which were executed, the contractors notified their subcontractors in writing that materials furnished by the latter should be shipped on Government bills of lading in cases where land-grant rates were available and that, in such instances, the Government would pay the freight charges and deduct the amount of the freight at the commercial rate from the amount due on the subcontract. Illustrative of such notices was one sent by the contractors under date of October 9, 1942, to the Cardos Corporation and which read in part as follows:
We wish to call your attention to the paragraph under section 4 of subject subcontract relative to land grant freight rate savings. This information is required for carload shipments only.
Carload shipments of materials to be used in connection with this subcontract can be shipped over some railroads on government bills of lading cheaper than on commercial bills of lading because government land grant freight rates are lower than commercial freight rates. All carload shipments are subject to this clause of your contract.
We request that you fill in the attached forms and return them to us in order that we may determine if there is a land grant freight rate saving. Make no carload shipments until you have been advised whether or not shipments are to be made on government bills of lading. You must furnish us with complete information for each carload shipment. The exact description of materials to be shipped must be shown on the attached forms. The destination is not the same as the project location, and you must furnish us with the exact destination, i. e., Cecil Field, Lee Field, etcetera.
Government bill of lading, if applicable, will be issued from the office of the Inspector of Naval Materials nearest the point of origin. The government will pay the freight charges, and full commercial freight will _ be deducted from your subcontract amount. If no saving is realized from the land grant freight rates, we will authorize you to ship the car on commercial bill of lading.
*750 29. In accordance with the terms of the subcontracts, the contractors made partial payments to the subcontractors from time to time as material was delivered or as work was accomplished. The payments so made to the subcontractors were included in the items for which the Government reimbursed the contractors as provided in Article 26 of the contract.
30. A few mechanical and electrical subcontracts were let on a cost-plus-a-fixed-fee basis. The terms of these subcontracts are not in evidence but the record shows that the materials needed were acquired through the contractors’ purchasing organization and shipped on Government bills of lading whenever savings could be made by use of the land-grant rates. Later, the practice was abandoned and subsequent electrical and mechanical subcontracts were let on the basis of a lump sum consideration.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover and its petition is therefore dismissed.

 This letter is set out in the immediately preceding paragraph.