**CHICAGO AND NORTH WESTERN RAILWAY COMPANY,**

v.

**THE UNITED STATES.**

No. 49291.

United States Court of Claims.

Oct. 5, 1954.

Warren Newcome, St. Paul, Minn., for the plaintiff. Lawrence Cake, Washington, D. C., was on the brief.

John B. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for the defendant. Frank J. Keating, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

The plaintiff is suing for an amount deducted by the Comptroller General from plaintiff's account with the defendant. This amount represents the difference between freight charges on certain shipments paid by the Government at the commercial rate and freight charges on these shipments at a lower statutory rate which, the defendant contends, is the highest rate that should have been applied. The matter is before us for decision on the merits.

During the years 1944 and 1945 the United States Maritime Commission sold substantial quantities of scrap steel to the North Western Steel & Wire Company and the Inland Steel Company. This scrap metal was sent from certain West Coast shipyards to plants of the steel companies in the Middle West over the lines of various rail carriers including the plaintiff. It was scrap resulting from the Commission's program to build ships, which were employed almost entirely for military and naval use during the war. Over 90% of the shipments were to the plant of North Western Steel & Wire Company at Sterling, Illinois. This plant was engaged in the manufacture of steel ingots and steel products and it used scrap steel as the principal raw material. The Maritime Commission shipments appear to have constituted only a small part of the total scrap used in the operations of the plant.

The Sterling plant had a steel ingot production of approximately 300,000 short tons per year; some ingots were sold as such, while others were made into a whole line of manufactured steel products. A certain part of the plant's products were shipped out over the lines of the Chicago and North Western and the Chicago, Burlington & Quincy Railway Companies. An analysis of these shipments indicates that less than 10% by weight went to military consignees. Furthermore, there is no evidence that the plant at Sterling or any other installation of the two steel companies was engaged in the performance of Government contracts.

The steel scrap was sent from the West Coast to the two steel companies pursuant to allocation orders of the War Production Board. The allocation system was set up by the Government to assure, as far as possible, that all steel mills would be kept running. The allocation orders in this case, unlike allocations issued to private dealers in scrap steel, contained a clause under shipping instructions which read as follows: "All material shipped shall be for resmelting purposes and for Military and Naval use only." The War Production Board, however, had no control over allocations issued by it once the allocation was reported completed.

Title to the scrap was in the United States until sold and delivered; the purchase contracts carried the notation: "Material to be owned by shipper until delivery to us at Sterling, Illinois." The Commission retained no control over the scrap after it was sold and delivered. The typical bill of lading for these shipments contained an endorsement by the United States Maritime Commission in these words: "Military or naval property of the United States moving for military or naval and not for civil use," and an endorsement by the carrier as follows: "to avoid delay in transportation, carriers execute this bill of lading

as prepared and tendered by the United States, but do not agree to notation thereon that the property shipped is military or naval property of the United States, moving for military or naval and not for civil use." Furthermore, testimony indicates that it was the policy of the Commission to make such notations for the purpose of taking advantage of land grant rates wherever possible.

We are of the opinion that under the facts of this case the plaintiff is entitled to recover. It is true that the scrap was the property of the United States until delivered; but the proof is insufficient to show that this was "military or naval property of the United States moving for military or naval and not for civil use". Only such property was exempt from paying the full commercial rates under Section 321(a) of the Transportation Act of 1940, 54 Stat. 898, 954, 49 U.S.C.A. § 65. Compliance by the plaintiff carrier with the provisions of Section 321(b) of the Act is uncontested.

In Northern Pacific R. Co. v. U. S., 330 U.S. 248, at page 254, 67 S.Ct. 747, at page 750, 91 L.Ed. 876, the Supreme Court said:

> "But in general the use to which the property is to be put is the controlling test of its military or naval character."

The facts clearly establish that the scrap was to be put to a predominantly civil use. It may well be that the plants here involved were doing work of importance to the defense of the country, but if that alone were a sufficient criterion a substantial distinction between military and civil uses could hardly ever be made in time of war. Nor does the fact that the scrap resulted from building ships for military or naval use make it (the scrap) property moving for military or naval use. The use to the military was, at most, very remote. The Supreme Court has thrown some light on this aspect of the case when it said

in the above mentioned case, 330 U.S. at page 254, 67 S.Ct. at page 750: "Military or naval property may move for civil use, as where Army or Navy surplus supplies are shipped for sale to the public."

The unilateral declaration on the part of the Government that the cargo was moving for military or naval use was not sufficient to determine the question whether or not the cargo was actually so moving. This conclusion is strengthened by other considerations, although we do not think any one of them by itself is controlling. The Government had no effective control over the use of the materials after they had been delivered. Nor did it have a very distinct knowledge of the use to which the scrap was to be put after delivery. The Government knew that there was a shortage of scrap steel in the Middle West and in the East and an oversupply on the Pacific Coast. The Government's principal consideration in directing the movement of scrap steel in this case appears to have been to alleviate this condition. There is no evidence that other factors were given any material weight in assigning allocations.

All the foregoing arguments force us to conclude that the shipments here were not "military or naval property of the United States moving for military or naval and not for civil use" as those words are used in the Transportation Act of 1940, supra.

The plaintiff is entitled to recover. Entry of judgment is suspended pending the filing either of a stipulation by the parties showing the agreed amount due or a report by the General Accounting Office showing the exact amount due.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and WHITAKER, JJ., concur.